LOUISVILLE & NASHVILLE RAILROAD COMPANY *v.* O. S.
SMITH, *for use, etc.*

(*Nashville.* December Term, 1910.)

1. **COMMON CARRIERS.** Evidence of improper tying of horses
by carrier will support a verdict for damages on account of
negligence.

In an action against a common carrier for injuries to horses
while in transit, evidence that the horses, after being unloaded
and fed, were improperly tied by the carrier's employees upon
reloading them, whereby the horses were injured, is sufficient
evidence of the carrier's negligence to support a verdict for
damages. (*Post, pp.* 686, 687.)

2. **SAME.** Limited liability contract for shipment of live
stock is not binding without option to take common law
liability contract.

Before the shipper can be bound by the terms of a limited liability
contract, it must appear that it was made known to him in
some form that the carrier was ready and willing to transport
the goods under the common law liability, and that a rate was
fixed therefor; that is to say, that a fair option was offered to
him to ship the goods under the common law liability of the
carrier at a rate fixed therefor, or under the limited liability
contract. (*Post, pp.* 687, 688.)

Cases cited and approved: Railroad v. Gilbert, 88 Tenn., 430;
Railroad v. Sowell, 90 Tenn., 17, 24; Deming v. Cotton Press
Co., 90 Tenn., 327; Railroad v. Stone, 112 Tenn., 348, 363 (and
citations on page 363).

3. **SAME.** Evidence held to be insufficient to show a fair op-
tion to shipper to take common law liability contract instead
of the limited liability contract.

In an action against a common carrier for injuries to horses while
in transit, the evidence is stated and held to be insufficient

Railroad v. Smith.

to show that the shipper was notified that the carrier would transport the stock under the common law liability at a rate fixed therefor, or that the shipper was given a fair option to ship under the common law liability, so as to make valid a limited liability contract. (*Post, pp.* 690-699.)

4. **SAME. Shipper, in the absence of fraud, is bound by unread limited liability contract for shipment of live stock.**

 A shipper, in the absence of fraud or misrepresentation on the part of the common carrier, is bound by a limited liability contract for the transportation of live stock, and is chargeable with notice of its contents, when executed by him, though he did not read it, if he was not fraudulently prevented from reading it. (*Post, pp.* 682, 683, 699.)

5. **SAME. Not bound to offer, formally or specifically, a common law liability contract, to make valid a limited liability contract for shipment of live stock.**

 It is not essential to the validity of a limited liability contract for the shipment of live stock that the common carrier shall formally or specifically tender to the shipper a contract or bill of lading in keeping with the common law liability. (*Post, pp.* 688, 700.)

Cases cited and approved: Railroad v. Sowell, 90 Tenn., 17, 24.

6. **SAME. Limited liability contract for shipment of live stock does not give notice to shipper of option to ship under common law liability contract, when.**

 A limited liability contract for the shipment of live stock, though reciting that the shipper might ship at the rates established by it therefor, or, in consideration of certain risks, duties, and liabilities assumed by the shipper, at greatly reduced rates, is not sufficient to give notice to the shipper that he has an opportunity to ship at rates imposing a common law liability upon the carrier, where there is nothing in the contract showing what was the full established rate of the carrier for such liability, and where the evidence did not show that the shipper knew what was the full rate "established" by the carrier. (*Post, pp.* 691, 694, 696-700.)

7. **REQUESTED INSTRUCTIONS.   Not correct in themselves are properly refused.**

Requested written instructions that are not correct in themselves are properly refused by the trial judge. (*Post, pp.* 699.)

8. **INTERSTATE COMMERCE.  Statute does not prevent State from refusing to enforce special-limited liability shipping contract.**

The right of a State to refuse to enforce a special live stock shipping contract limiting the liability of a common carrier, made in another State, is not affected by the interstate commerce law. (*Post, p.* 701.)

Acts of congress cited and construed:  Act of Feb. 4, 1887, ch. 104, 24 Stat., 379.

Case cited and approved:  Railroad v. Hughes, 191 U. S., 477.

9. **REQUESTED INSTRUCTIONS.   Not considered where the whole charge does not appear in the record.**

Where the whole charge does not appear in the record, the supreme court will not consider assignments of error based upon special requests refused or given.  (*Post, pp.* 701, 702.)

10. **SAME.   Same.  Considered when so diverse from that portion of the general charge appearing in the record that it is impossible to conceive that the special requests were included in it.**

Where the special requests are so diverse from that portion of the general charge appearing in the record that it was not possible to conceive that the trial judge had given such special instructions in his general charge, the supreme court may depart from the rule stated in the preceding headnote, and consider the assignments of error based upon special requests refused or given.  (*Post, pp.* 682, 683, 702.)

11. **COMMON CARRIERS.  Limitation of liability to one-third or one-half of the value of live stock shipped is unreasonable and void, when.**

A live stock shipping contract, limiting the liability of the carrier to a specific amount as the agreed value of the animals, by a printed provision, in the case of stallions, is unreasonable

Railroad v. Smith.

and of no force, where the stallions actually shipped and injured by the carrier's negligence are worth at their market value two, three, or four times as much as the amount limited; for such pretended agreed valuation is a mere cloak to avoid or limit the carrier's liability for its negligence. (*Post, pp.* 704- 712.)

Cases cited and approved: Railroad v. Stone, 112 Tenn., 348; Berry v. Railroad (S. D.); 124 N. W., 859, 863, 864; Railroad v. Jones, 132 Ala., 437, 441, 442; Express Co. v. Owens, 146 Ala., 412; Express Co. v. Gibbs, 155 Ala., 303; Railroad v. Keener, 93 Ga., 808; Railroad v. Murphy, 113 Ga., 514; Railroad v. Hall, 124 Ga., 322; Express Co. v. Bachman, 28 Ohio St., 144.

12. SAME. Same. Against public policy to enforce such contracts, though made in another State; but comity was not considered.

It is against the public policy of this State to enforce such contracts limiting the liability of the carrier where the valuations contained therein range from one-half to one-fourth of the market value of the stock shipped, it seems even though such contract was made in another State; but the question of comity was not considered, because it seems such contracts are not enforceable in Kentucky where the contract involved in this case was made. (*Post, pp.* 704-712 and especially 712.)

Cases cited and approved: Railroad v. Graves, 52 S. W., 961; Express Co. v. Walker, 119 Ky., 121.

## FROM GILES.

Appeal in error from the Circuit Court of Giles County to the Court of Civil Appeals, and by *Certiorari* from the Court of Civil Appeals to the Supreme Court. — SAM HOLDING, Judge.

Railroad v. Smith.

E. E. ESLICK, for plaintiff in error.

BEN CHILDERS, for defendant in error.

MR. JUSTICE NEIL delivered the opinion of the Court.

This action was brought originally before a justice of the peace of Giles county for injuries alleged to have been inflicted upon two stallions in course of shipment from Shelby City, Ky., to Lynnville, Tenn. There was a judgment before the justice of the peace, and the case was appealed to the circuit court of Giles county, and there tried, resulting in a judgment of $450 in favor of the plaintiff below. From this judgment an appeal was prayed and prosecuted by the railway company to the court of civil appeals, and there the judgment of the trial court was affirmed. The case was then brought to this court by the writ of *certiorari*, and was argued at the bar.

The charge of the court below is not before us. In lieu thereof there is the following memorandum in the bill of exceptions, under hand of the trial judge, viz.:

"There was no exception to the charge of the court, except with reference to the measure of damages. The defendant relied upon the agreed value clause in the bill of lading; but the court ignored this clause, and instructed the jury that if, under the instructions given them, they found the defendant justly liable, then the plaintiff would be entitled to recover the difference in the market value of the two stallions between the condition

in which they were delivered to the defendant and the condition of the same in the injured condition. In other words, the plaintiff would be entitled to recover for the loss of value in the market due to the injuries caused by the defendant's negligence."

The errors assigned are as follows:

First, that there was no evidence to support the verdict.

Second, the charge of the court upon the subject of the valuation clause above referred to.

Third, that the court refused to charge special request No. 1, submitted in behalf of defendant below as follows:

"If you find that neither plaintiff nor his agent read the contract in evidence in this case, but that the agent of plaintiff simply signed the contract presented by the railroad company, and never read it, and that plaintiff's failure to read it, or the agent of plaintiff's failure to read it, was not induced by fraud, misrepresentation, or mistake of the railroad company, said contract was nevertheless notice to the shipper that he might ship under either the full rate contract or the limited rate contract."

Also in refusing special request No. 4 in behalf of defendant below, as follows:

"If you find that the plaintiff did not read the contract of affreightment in evidence in this case, and that plaintiff's agent did not read the same, but that said agent simply signed the contract presented by the defendant railroad company, and never read it, and that his failure to read it was not induced by fraud, misrepresentation,

or mistake on the part of defendant railroad company, the plaintiff will be nevertheless conclusively presumed to know, at the time said contract was accepted and signed by his agent, O. S. Smith, that said contract contained the following clauses, to wit:

" 'That the carrier will carry live stock at the rates established by it therefor, or where certain risks and liabilities are assumed by the shipper as hereinafter specified will carry such live stock at greatly reduced rates.

" 'In the present instance the shipper elects to avail himself of the said reduced rates, and has delivered on the cars of the carrier the following described stock, to wit: [Description of stock, etc.]'

"And plaintiff is therefore conclusively presumed to know that he could have availed himself of the reduced rate limited liability contract, or the full rate liability contract. Neither the shipper nor the agent was obliged to sign the contract, which was signed by O. S. Smith, the agent for the plaintiff; but, if he saw fit to do so, the shipper will be conclusively held to know that said contract contained said clauses, unless the failure of O. S. Smith, agent for the plaintiff, to read said contract, was due to the fraud, misrepresentation, or mistake of the defendant railroad company."

Fourth, that the court erred in refusing to give in charge special request No. 7 in behalf of defendant below, as follows:

"The live stock involved in this lawsuit was shipped by the plaintiff from Shelby City, Ky., to Lynnville, Tenn.,

thence to Pulaski, Tenn., and the same was an interstate shipment, and as such is governed by the act relating to the shipment of commerce between states.  If the plaintiff shipped these horses on a declared valuation, securing a lower rate of transportation, the plaintiff would be prohibited from collecting a larger amount by way of damages than the declared valuation at the time of entering into the contract of shipment."

Also in refusing to charge request No. 9 in behalf of defendant below, which is as follows:

"If the shipper shipped these horses over the line of defendant under the contract, wherein the values of these horses was fixed, that is, these stallions at $150 each, and upon these values, and under this contract so fixing the values, this cheaper freight rate was made the plaintiff, then plaintiff would not be entitled to collect damages for these horses upon a higher valuation than that which was the basis of securing the transportation in this case, $150 a head; $150 per head being the largest amount for which the defendant would be liable under said contract."

Also in refusing to charge special request No. 10 in behalf of defendant below, which was as follows:

"It is admitted by the plaintiff that O. S. Smith was his agent in the shipment of these horses involved in this case, and, that being true, the knowledge of O. S. Smith, agent, and his acts in making the contract and fixing the values of the horses, would be acts of the plaintiff J. L. Amis, and would be binding on him."

We shall now consider these assignments of error.

There was evidence of negligence in this: O. S. Smith testified that he attended to the loading of the car; also to the making of the stalls or partitions therein; that he had upright scantlings put in the car and securely nailed, and banisters nailed to these, so as to place the animals separate from each other, cutting up the car into stalls; that the stock were tied short (there were several other horses besides the two in question), so that the stallions could not fight. They were securely tied with sea-grass ropes running in both directions, so that they could not move any distance. One stallion was put in one end of the car, and the other stallion in the other end. They were well and securely tied. When the car got to Lynnville, it showed that the live stock had been unloaded and were not put back in the car carefully. One of the stallions showed that he had been tied with a long rein to the rope, and the other one was almost loose, and they were close together. When they reached Lynnville, one of them, described as a bay, had a capped hock and a hock that was boggy. The other, described as dark bay or brown, was hurt on the ankle, and some skin was off his shin. These injuries rendered them permanently lame. These horses were sound and in good condition when they were loaded. The railway company introduced evidence to the effect that the cars were carefully handled all the way from Shelby City to Lynnville, but admitted that they had been unloaded at Nashville for feeding purposes, and had been reloaded. The manner in which the horses were tied was evidence of negligence

sufficient to justify the jury in finding the railway company was liable for damages.

The next question to be considered is whether it was liable for the amount found by the jury. In reaching this amount the jury were bound under the judges's charge to disregard the values fixed in the contract.

We are therefore now to determine whether he was justified, under the state of the record as it appeared to him, in so charging the jury.

Before stating the evidence applicable to this phase of the case, it must be premised, as authorities upon this subject agree, that before the shipper can be bound by the terms of a limited liability contract it must appear that it was made known to him in some form that the railway company was ready and willing to ship the goods under its common-law liability and that a rate was fixed therefor; that is to say, that a fair option was offered to him to ship the goods under the common-law liability of the railway at a rate fixed therefor or under the limited liability contract. *Railroad* v. *Stone & Haslett,* 112 Tenn., 348, 363, 79 S. W., 1031, 1034, and authorities cited on the latter page. In one of these cases, *Railroad* v. *Gilbert, Parkes & Co.,* 88 Tenn., 430, 12 S. W., 1018, it is said:

"A company standing before the public as a common carrier and enjoying the advantages and franchises as such must be ready to do the business of a common carrier with the full measure of responsibility imposed by the common law; and it at the same time may offer to do the same business with a limited liability, the limitation resting upon a sufficient consideration. An

offer, or readiness to transport the goods of its customer with the one or the other degree of responsibility, at his option, is as little as can be required of any common carrier. Less than this does not present a *bona fide* and reasonable alternative. Reduction of freight charges is the usual consideration for the diminution of responsibility on the part of the company."

In another of these cases, *Railroad v. Sowell,* 90 Tenn., 17, 24, 15 S. W., 837, 838, it is said:

"Both the witness for plaintiff and defendant agreed that no other contract than that signed was tendered; but they also agreed that no other was demanded. It was therefore competent for the defendant to show that it was willing and ready to execute another upon terms reasonable to the shipper, if he preferred it, in which no agreed valuation or limitation of liability was required as a prerequisite to the shipment. He need not specifically tender another contract. An offer or readiness to make it is sufficient."

In still another of these authorities, *Deming & Co. v. Merchants' Cotton Press, etc., Co.,* 90 Tenn., 327, 17 S. W., 93, 13 L. R. A., 518, it is said:

"The option need not in fact be offered to the shipper. It is sufficient if it would have been given had he demanded it."

In *Railroad v. Stone & Haslett,* supra, the special limited liability contract tendered to the shipper, and executed by him and the railroad company, recited in its face, in the first line thereof, that the tariff rate on the shipment from Shelbyville, Tenn., to Louisville, Ky., was $82 per car; thus, as said in the opinion, indicat-

ing to the shipper the regular tariff rate. It then recited that the company would transport the stock at the reduced rate of $41 per car in consideration that the shipper would accept certain risks of transportation. As also said in the opinion in that case, the record showed that the shipping agents of the defendant company had instructions to issue a bill of lading of common-law liability if the shipper demanded it, and that the tariff rate on such a bill of lading would be twice the special rate. It was shown that the agent of the company at Shelbyville, Tenn., was authorized to receive the hogs for shipment without the execution of a special live stock contract, but upon the company's common-law liability.

It also appeared in that case that, over the objection of defendants, testimony of the plaintiffs below and of other shippers was admitted to the effect that they had no knowledge of any bill of lading for the shipment of live stock other than the special live stock contract under which the shipment in question was made, and did not know of any other contract under which stock could have been shipped; that they had never been offered any other or different contract in all their experience as shippers. It was held that this testimony was relevant to the issue as to whether defendant company had a common-law contract of shipment, and held itself in readiness to give the shipper the benefit of such an alternative; that it was competent for the purpose of contradicting the evidence introduced on behalf of the company tending to show that the company held itself in readiness to give the

shipper the benefit of such common-law contract.

The special limited liability contract executed by the parties in the present case was as follows:

"Louisville & Nashville Railroad Company's. Contract for the Transportation of Live Stock over Its Own Lines.

.    _ "Shelby City, Kentucky.

"W. Depot, Route 61, Station,. 2/21, '07.

"This contract, entered into at the above time and place, between the Louisville & Nashville Railroad Company, hereinafter called the carrier, and O. S. Smith, hereinafter called the shipper:

"Witnesses, that the carrier will carry live stock at the rates established by it therefor, or where certain risks, duties, and liabilities are assumed by the shipper, as hereinafter specified, will carry such live stock at greatly reduced rates.

"In the present instance the shipper elects to avail himself of the said reduced rate, and has delivered on the cars of the carrier the following described live stock, to wit:

| Consignee, Destina-tion, &c.. | Description of Stock. | Car No. |
| --- | --- | --- |
| O. S. Smith, ·Lynville, Tennessee. | 7 horses, S. L. & Co., | L. & N. · 9955 |

⁻"Charges, $...........

"The carrier agrees to transport said live stock to destination, if on said carrier's line of railroad, otherwise to the place where said live stock is to be received by the next connecting carrier for transportation to or

towards destination, and the carrier guarantees that the freight rate thereon from point of shipment to destination shall not exceed the reduced rate of $46 per car to Lynnville, Tenn.

"In consideration of all of which the shipper hereby agrees to assume the risks, duties, and liabilities hereinafter specified, and that the transportation shall be upon the following conditions, which are admitted and accepted by said shipper as just and reasonable, viz.:

"(1) The shipper hereby releases the carrier from all liability in the transportation of said live stock, except as hereinafter agreed, and agrees that such liability shall be only that of a private carrier for hire, and that all liability of the carrier shall cease at the station to which such live stock is destined, if its destination be on the carrier's line of railroad, or, if destined to a point beyond said carrier's line of railroad, then at said carrier's station, at its terminus, when ready to be delivered to the shipper, consignee, or carrier whose line may constitute a part of the route to destination.

"(2) The shipper has examined and found in good order and condition the car or cars provided by said carrier for the transportation of said animals, and hereby accepts the same, and agrees that they are, as thus provided, suitable and sufficient for said purpose; and said shipper will at his own expense provide such bedding or other suitable appliances in said car or cars as will enable said animals to stand securely on their feet while in the same; and said shipper hereby releases said carrier from all liability for and on account of any and all

injury or injuries which the said animals, or any of them, may receive in consequence of any or either of them being vicious, wild, unruly, or weak; and in consequence of any of them being killed, or maimed, bruised, or otherwise injured; and in consequence of heat, suffocation, or other ill effects of being crowded in the cars; in consequence of being injured by the burning of hay, straw, or other material used by the shipper or his agent for feeding or bedding the said animals, or otherwise; and also from all damage or injury or loss which may be sustained by reason of any delay or detention in such transportation, whether occasioned by any mob, strike, or threatened violence to person or property from any source, and from any injury to track or yards, and from any and all other causes, whether mentioned herein or not, and from the escape of any of said animals, and for loss or damage to said animals from any cause or thing whatever not resulting from the negligence of the agents or servants of said carrier.

"(3) Said shipper will separate the different kinds of stock in said car or cars by strong partitions, which he will provide at his own expense and risk, and said stock shipped in mixed car load or car loads shall be at the entire risk of the shipper on account of any damage that may occur by reason of partitions in said car or cars not being properly made and sufficiently strong to prevent damage to said stock.

"(4) Said shipper will load and unload said animals at his own risk, and feed, water, and attend to the same

at his own expense and risk while they are in the stock-yards of the carrier awaiting shipment, and while on the cars or at feeding or transfer points, or where they may be unloaded for any purpose.

"(5)  Said shipper will see that said animals are securely placed in the cars furnished, and that the cars are securely and properly fastened, so as to prevent the escape of said animals therefrom.

"(6)  The employees of the said carrier shall provide the owner or person in charge of the said animals all proper facilities on trains and at stations for taking care of the same, but the business of the said carrier shall not be delayed by the detention of trains to unload and reload said animals for any cause whatever; but the cars may be left at a station upon the request of the person in charge of the same, and unloaded and reloaded by him to be forwarded by the next freight train, if he so directs; and said carrier shall not be held liable for any damage or injury that may occur to said animals during the time the same may remain so unloaded and out of the cars as aforesaid; and in case said animals are kept over at any given point by the said shipper or his agent beyond a reasonable length of time for feeding and watering, subject always to local laws of any State through which they may pass while in transit, then this contract shall be held to be voidable, at the option of the said carrier, and in such case such rates of freight may be imposed and collected by said carrier as may be deemed proper, not to exceed local rates from point where received for transportation to such point of detention.

"(7) In case of accident to or delay of trains, from any cause whatever, the shipper is to feed, water, and take proper care of said animals at his own expense.

"(8) The presentation of this bill of lading shall be sufficient evidence of ownership to relieve and release the carrier from all liability on account of wrong delivery, but shall not be held to operate against the rights of the carrier to demand, if it elect, the identification of the party presenting this contract before delivering the said animals to him.

"(9) Should damage occur for which the said carrier may be liable, the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed for a stallion or jack, $150; for a horse or mule, $75; mare and colt together, $100; cow and calf together, $35; domestic horned animals, $30 each; calves, hogs, or sheep, $5 each, which amounts it is agreed are as much as such animals as are herein agreed to be transported are reasonably worth.

"(10) In case the said carrier shall furnish laborers to assist in loading and unloading said animals, they shall be subject to the orders and deemed employees of said shipper while assisting.

"(11) As a condition precedent to the shipper's right to recover any damages for loss or injury to said animals, he will give notice in writing of his claim thereof to the agent of the railroad company or other carrier from whom he receives said animals before said animals are removed from the place of destination above mentioned, or from the place of delivery of the same to

Railroad v. Smith.

said shipper, and before said animals are mingled with other animals.

"(12) When necessary for said animals to be transported over the line or lines of any other carrier or carriers to the point of destination, this contract shall, unless otherwise agreed in writing between such other carrier or carriers and the shipper, constitute the contract between the shipper and each of such other carriers, respectively, for the transportation over so much of its line as said shipment passes over in order to reach destination; and in no event shall one carrier be liable for the transportation of said animals over the line or lines of any other carrier, or liable for the negligence of any other carrier or carriers.

"In witness whereof, the parties hereto have hereunto subscribed their names.

"Witness:

<blockquote>
"Louisville & Nashville R. R. Co.,

"By W. C. Silcox, Agent.

"O. S. Smith."
</blockquote>

It is observed that this contract does not state the rate for shipment under the common-law liability, nor is there any evidence that this common-law rate was known to the shipper, or that this rate was posted for examination. There is nothing in the record to indicate that his attention was called to this matter, further than may be inferred from the two lines near the beginning of the contract, viz.: "That the carrier will carry live stock at the rates established by it therefor, or, where certain risks, duties, and liabilities are assumed by the

shipper, as hereinafter specified, will carry such live stock at greatly reduced rates."

The bill of exceptions reports O. S. Smith as testifying on this subject as follows:

"That he had a considerable amount of experience in shipping live stock, but did not know that the defendant company had two contracts or rates for the shipping of live stock, one the usual shipper's contract, known as the reduced rate and limited liability contract, and the other the full rate contract with common-law or full liability; that only the contract read in the evidence had been offered to him by the agent of the defendant company at Shelby City, Ky.; that he had not called for any other kind of a contract, but simply said to the agent that he wanted to ship this live stock, and ordered the car, and, when ready to ship them, this contract was offered him, and that he signed the same, and asked no questions whatever; that in fact he knew of no other contract of shipment, and asked about none."

The only other evidence upon this subject is that of Mr. Silcox, the agent of the company at Shelby City, Ky. It was as follows:

"Q. 7. Will you please file as a part of this deposition a copy of the bill of lading issued to O. S. Smith for this shipment? A. Contract only; haven't the original, so couldn't make copy; original to freight account at Louisville, Ky. Q. 8. So was this bill of lading, issued to him, the usual shipper's contract at the reduced rate? A. Yes; at regular reduced car load rate, at $46 per car. Q. 9. Did the shipper, O. S. Smith, call for any special con-

tract? If so, what contract did he call for? A. No. Ship-
ment on company's contract is always used. [Q. 10. con-
cerns the payment of freight, which is immaterial to the
present controversy.] Q. 11. Did you have any other bill
of lading for the shipment of horses, live stock, etc.; and,
if so, what is the difference in the rate between this bill
of lading or contract and the one issued to O. S. Smith?
A. No; there was none.    Q. 12. For the other contract,
or full rate contract, what is the rate per _hundred
pounds for the shipment of horses from Shelby City,
Ky., to Lynnville, Tenn.?    A. Car load rates lowest on
that number of horses.  Q. 13. Please file as a part of this
deposition one of the full rate bills of lading or shipper's
contract.   A. I haven't it, and could not get it, so could
not file it.   Q. 14. Did O. S. Smith call for the last-named
contract; that is, full liability and full freight contract?
A. No. Q. 15. Had he called for such contract, were you
prepared and ready, as agent of the defendant company,
to issue to him such contract for the shipment of the
horses? A. Shipment under contract takes rate as billed;
if the shipper refuses to  ship  as ——— to ——— per
company's contract, double the rate used applies.   Q. 16.
Did you offer Mr. Smith a full rate and full liability
contract, and tell him that you had such contract?   A.
I don't remember.   Q. 17. If not, why did you not offer
to issue to him such contract?   A. I don't remember why
I did not."

Cross-examination : "Q. Did you offer to submit any
other than the usual yellow [the special limited liability
contract] bill of lading and contract?   A.   I don't re-

member whether I did or not. Q. 3. Did you ever let on to Smith that you had any other kind? A. I don't remember. Q. 4. Did Smith know it? A. I don't know whether he did or not. Q. 5. When did you yourself first hear that there was a different contract for shippers than the usual yellow one? A. When I was first agent there at Shelby City. Q. 6. When did you first see a sample of one? A. I don't remember. Q. 7. Be sure to file a sample copy of this sort of contract? As a part of your deposition, mark it for identification. A. I can't do it. Q. 8. What is the difference between it and the usual one? A. The company's contract is first-class rates, and the other contract is to double the rate used. Q. 9. Did you ever at any time to anybody disclose the readiness of the defendant railroad company to ship on any other than the usual yellow stock contract? I don't remember that."

The foregoing is all of the evidence upon the subject. From this we think it perfectly apparent that, while plaintiff in error's agent knew that the rate would be double that stated in the special contract in case any one should refuse that contract, he had no bills of lading or forms for such a shipment, and was not ready to make a shipment on the basis of the common-law liability of his principal. It is evident that he had no knowledge of any shipment of live stock having been made on that basis. He even shows an ignorant bewilderment concerning that aspect of the company's duties. The standpoint from which the double rate struck his mind was, clearly, that of penalty; that is to say, that if the shipper failed to accept the special contract offered him,

he would have to pay double rates. The conclusion to be drawn from this is plain and irresistible of itself; but its force is added to by the fact that no rate for the common-law shipment was mentioned in the contract, or by the agent, or was posted, or was known to the shipper. It is impossible to hold under these circumstances that the shipper was given a fair option. The jury was justified in finding that such option was not given, and the trial judge was justified in instructing them, in effect, that in assessing damages, if they should find the defendant liable, they should disregard the values fixed in the special contract.

It is true, as stated in special request No. 1 and special request No. 4, that the plaintiff below could predicate no relief against the limited contract on the ground that he did not read it, and that, having executed that contract, he was chargeable with notice of its contents, in the absence of fraud or misrepresentation on the part of the railway company whereby he was prevented from reading it. Still these requests were properly refused by the trial judge, because they gave an incorrect construction of the contract. Said contract, as drawn, was not, without more, "notice to the shipper that he might ship either under the full rate contract or the limited rate contract." From the language quoted in the fourth special request the shipper could not be "conclusively presumed to know he could have availed himself of the reduced rate limited liability contract or the full rate common-law liability contract." The contract should have stated the full rate in its face, as was done in that

which was considered in *Railroad* v. *Stone & Haslett*, supra. Of course, if the evidence had shown that the shipper knew the full rate "established" by the company, and that it had been so established as the price of carriage on the basis of the common-law liability, then the language copied from the contract would have given him notice that the company was willing to ship on those terms; but that language, standing alone, does not convey that suggestion. Moreover, when taken in connection with the evidence of O. S. Smith, above set out, it is clear that it could have had no such meaning to him as that insisted upon in the two requests referred to. Although it is not essential, as we have held that the company shall formally tender to the shipper a contract or bill of lading in keeping with the common-law liability, yet such is the disparity of situation and of potentialities between the shipper and carrier that it sould be made plain to the latter that he has the option referred to. It must not be left for him to gather it by dark and uncertain inference. The soundness of this view is abundantly apparent from the evidence in the present case. It is perfectly clear, from the testimony of the company's agent, that he did not regard the "double rate" as within the ordinary run of business at all, but as a bare contingency to arise upon the refusal of some one to accept the "yellow contract" (the special limited liability contract), and that the latter was the customary contract, represented the customary mode of shipment, and that he had no knowledge that any other had ever been used. Within his knowledge it was the only rate within prac-

tical use, and the shipper had never so much as heard of the other rate.

Special instructions Nos. 7, 9, and 10, referred to under the fourth assignment, were properly refused. According to the seventh instruction: "If the plaintiff shipped these horses on a declared valuation, securing a lower rate of transportation, the plaintiff would now be prohibited from collecting a larger amount by way of damages than the declared valuation at the time of entering into the contract of shipment." This would depend upon whether he was given the *bona fide* option already referred to; and so this request, as written, was not correct, and under the well-known rule upon this subject could not have been properly given. What has just been said is also applicable to the ninth instruction. The tenth instruction stated a sound proposition, but, in view of what has been already said, was immaterial. So much of the seventh instruction as refers to the interstate commerce law (Act Feb. 4, 1887, c. 104, 24 Stat., 379 [U. S. Comp. St. 1901, p. 3154]) is immaterial, since that has no bearing upon the right of a State to refuse to enforce a special contract limiting the liability of a carrier, though made in a foreign State. *Pennslyvania R. R. Co.* v. *Hughes,* 191 U. S., 477, 24 Sup. Ct., 132, 48 L. Ed., 268. We have gone through these several special instructions, notwithstanding the rule that, where the whole charge does not appear in the record, the court will not consider assignments based on special requests refused or given; the ground of the rule being that, in the absence of the charge, the court cannot know how far those refused al-

ready appeared, in substance, in the charge, nor to what extent deficiencies were supplied by special instructions given, nor, indeed, the full bearing of any of these matters, without the opportunity of inspecting the charge as a whole, and so cannot say whether there was error or not in the refusal or in the granting of such special charges. We have departed from the rule in the present instance, in view of plaintiff in error's contention that these instructions were so diverse from that portion of the charge which was given that it was not possible to conceive that the trial judge had given such special instructions. Without either conceding or denying this contention, we deemed it best to consider these instructions upon their merits.

One other point remains. The ground on which the case of *Railroad* v. *Stone & Haslett,* supra, was decided has been vigorously attacked, and we have been asked to overrule that case to that extent. The contract considered in that case contained, among other things, the following: "And it is further agreed that, should damage occur for which the said party of the first part may be liable, the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed for a horse or mule, $100; cattle, $30 each; chickens, ducks, and guinea fowls, 75 cents per dozen; geese, $1 per dozen; turkeys $1.50 per dozen; other animals at $5 each; which amounts it is agreed are as much as such animals herein agreed to be transported are reasonably worth." The property transported consisted of

Railroad v. Smith.

hogs. The court held they came under the language, "other animals at $5 each." The evidence showed that the hogs were worth two or three times the valuation fixed upon them by the contract, and that such valuation was unreasonable, and the court refused to enforce it, "in view of the fact that the shipper has to accept the contract tendered by the carrier in order to get reduced rates of shipment, and has little to do with formulating the details of the contract;" the parties not standing on equal terms; the shipper "being only one individual in a million, he cannot afford to higgle, and stand out, and seek redress in the court. His business will not admit of such a course. He prefers, rather, to accept any bill of lading or sign any paper the carrier presents."

In a recent case decided by the supreme court of South Dakota, *Berry* v. *Chicago, M. & St. P. Ry. Co.* (Jan. 26, 1910), 124 N. W., 859, the same conclusion was reached. In that case horses were shipped under a special limitted liability contract, and valued at $100 each. The evidence showed that they averaged in value over $250 each, and the court held this difference was so great as to make the valuation fixed in the contract unreasonable, and refused to enforce it. The court referred with approval to Hutchinson on Carriers, section 426, as stating the rule to be that, if the value contained in the shipping contract was fixed without any reference to the real value of the goods, the limitation would be considered as an attempt by the carrier to secure a partial exemption from liability, and, in so far as its validity was concerned, it would stand on the same footing as any

other condition intended to secure immunity from the consequences of negligence, and that if a loss should occur, which was attributable to the carrier's negligence, a condition by which it was attempted to fix the amount recoverable at a certain sum, irrespective of the real value of the goods, could not avail the carrier, and the owner would recover the full extent of his real loss. It was said that the rule in some jurisdictions was that the carrier, in order that he might exercise a degree of care and attention commensurate with the risk assumed, was entitled to be informed of the value of the goods intrusted to him for transportation, and that a contract, when fairly entered into with a view of placing a *bona fide* value on the goods, would be conclusive on the owner, and the carrier would not be liable for a greater sum than that at which the goods were valued, although his own misconduct had caused the loss, citing Hutchinson on Carriers, section 426. The court then quoted with approval section 427 from the same learned work, as follows:

"But, while the owner of the goods and the carrier may fix a value on the goods beyond which the carrier, in the event of loss, will not be liable, the agreement fixing the value, in order to be conclusive on the owner, must be *bona fide* and the value reasonable. If, for instance, the value agreed upon should be so far below the real value of the goods that from their appearance the carrier must have known the discrepancy, the agreement fixing the value would not be *bona fide,* and, depending on no value at all, would amount to an arbitrary limi-

tation upon the carrier's legal liability, which, in the event of loss occasioned by negligence, would not deprive the owner of the right to recover the real value of the goods.   While it is true that the owner of goods of great value which are concealed in packages, or otherwise hidden from view, upon which a very inconsiderable value has been placed by him, will be precluded, in case of loss, from the right to recover a greater sum than the value which he has placed upon them, the reason for this exception is that to charge the carrier with their real value, when by the owner's misrepresentation he has been induced to undertake the employment at a reduced compensation, and to lessen the degree of care and vigilance which he otherwise would have exercised, would be to sanction fraud, and to enable the owner to gain an unfair advantage over the carrier through his own misrepresentation.   The knowledge which the carrier has of the real value of the goods tendered to him for shipment would therefore seem to be material in determining the effect of the valuation agreement upon his liability, although a contrary conclusion has been reached by some courts.   And it may be stated as the better rule that, where the value agreed upon is so out of harmony with the ordinary values of similar kinds of goods as to indicate that the question of value did not in fact enter into the agreement, and the carrier, under the circumstances, must have known of the discrepancy, the agreement placing a value upon the goods will be considered as a mere attempt by the carrier to

15 Cates—45

secure a partial exemption from liability, and of no effect in relieving him from the obligation of responding for their real value where his misconduct has occasioned their loss. So, in the absence of fraud or concealment on the part of the owner of the goods, whereby the carrier has been misled, the valuation agreed upon, it is said, must be reasonable, regard being had to the real value of the goods; and if such value be unreasonable, the owner will not be estopped from claiming damages on the basis of their real value."

The court then continued:

"When we take into consideration that the undisputed evidence shows that the horses in question were young farm animals weighing about 1,400 pounds each, and averaging in value something over $250 each, it is very easily discernible that the parties never attempted to fix a *bona fide* value thereon. The difference between the real value and the value as fixed by the contract is too great, is too unreasonable. The apppellant's agents, authorized to receive these horses for transportation, had ample opportunity to know the real or approximate value thereof, and could not by any means have been misled in relation thereto. It does not appear from the evidence that as a matter of fact the value of these horses, or horses of this class, had anything to do with fixing the freight rate thereon. The only reference thereto is in the recitals of the contract, and which would as readily lead one to infer that the freight rate was based on weight rather than value; that all common horses of the class shipped under this contract go

Railroad v. Smith.

at the same rate, regardless of value. Therefore we are constrained to the view that the limitation of value of $100 each, mentioned in the terms of said contract, was placed therein without any reference to the real value of the particular horses shipped under this contract, and that under the circumstances of this case such limitation should be considered as an attempt by respondent to secure partial exemption from liability, and stands on the same footing as any other condition intended to secure immunity from the consequences of negligence." *Berry* v. *Chicago, M. & St. P. Ry. Co.,* 124 N. W., 859, 863, 864.

The same rule is declared in *Southern Railway Company* v. *Jones,* 132 Ala., 437, 441, 442, 31 South., 501, 502. The court, through McClellan, C. J., said that it was settled in that State (1) that a carrier could not contract against his own negligence; (2) that in consideration of reduced freight charges the carrier could contract that, in case of loss occurring from his own fault or negligence, the value of the property at the time and place of shipment, not exceeding an expressed sum, should be the measure of recovery; and (3) "it has also been declared by this court that under such contract recovery will be limited to the sum so expressed, unless the real value of the property is greatly disproportionate thereto—so much greater than the stipulated maximum of the value and liability as to render the contract unreasonable, and therefore not binding on the shipper." In discussing these points the Chief Justice said that he had always entertained doubts of the

soundness of the second proposition; but, conceding it
to be settled, it was largely sheared of its power to do
harm by the third. This he said was based on public
policy; and that, in determining whether a stipulation
was void as against public policy, there was no reason
for inquiry into the knowledge, information, or intention
of the parties; that the question was, not what the par-
ties knew or intended, but what was the effect of the
stipulation, whether to allow and uphold such contracts
would be fraught with wrong and injury to the people
of a character from which it was the province and duty
of government to protect them. This doctrine has been
reaffirmed by the supreme court of Alabama in two re-
cent cases: *Southern Express Co.* v. *Owens* (1906), 146
Ala., 412, 41 South., 752, 8 L. R. A. (N. S.), 369, 119 Am.
St. Rep., 41, 9 Am. & Eng. Ann. Cas., 1143; *Southern Ex-
press Co.* v. *Gibbs* (1908), 155 Ala., 303, 46 South., 465,
18 L. R. A. (N. S.), 874; 130 Am. St. Rep., 24.

In accord is *Railroad* v. *Keener*, 93 Ga., 808, 21 S. E.,
287, 44 Am. St. Rep., 197, wherein it is said: "The prin-
ciple which relieves the carrier from liability for more
than the agreed value does not apply where the valua-
tion is small, arbitrary, and fixed without reference to
the real value of the goods, and this is understood by
the carrier as well as the shipper. In this case there
was no inquiry on the part of the carrier as to the value
of the goods, and it is clear that a valuation of $5 per
100 pounds for wearing apparel and household goods in-
discriminately could not have been understood to rep-
resent their actual value. The contract in question was

Railroad v. Smith.

simply an attempt to limit liability of the carrier, without regard to the actual value of the property, and it follows from what we have said that it was inoperative for that purpose, if the loss was occasioned by negligence on the part of the defendant." See, to same effect, *Central of Georgia R. Co.* v. *Murphy*, 113 Ga., 514, 38 S. E., 970, 53 L. R. A., 720; *Central of Georgia R. Co.* v. *Hall*, 124 Ga., 322, 52 S. E., 679, 4 L. R. A. (N. S.), 900, 110 Am. St. Rep., 170.

But it is insisted by plaintiff in error that it is to the interest of shippers and carriers that these special contracts be sustained in their present form, since by putting all on the same footing they protect shippers generally from secret agreements for rebates with special shippers, and carriers from the shipper's fraud arising from overvaluation after loss. We are of the opinion, however, that the better guaranty is to be found along the lines indicated in *Railroad* v. *Stone & Haslett*, and the authorities which we have cited in accord therewith. It cannot be true that the public interest will be subserved by sustaining contracts which permit the carrier to settle with the shipper for the negligent loss of or injury to his property by the payment of far less than its value, under agreements in form voluntary, but in substance the result of the compulsory force of the shipper's surroundings, the needs of his business, and the necessity he is under to employ the services of the carrier. In the case now before the court, it appears that the general valuation placed upon stallions in the contract was not more than half the

Railroad v. Smith.

market value of one of them, and not more than one-fourth the value of the other. These valuations were not prepared for the special animals in question, but were contained in the printed form of contract, and printed therein when the contract was presented to the shipper for his signature, applying, of course, to all stallions that might be offered for shipment, without any special consideration of the actual values of the individual animals covered by the contract. It is manifest that there was no attempt to ascertain or agree upon the values of the special animals now in question, as distinguishable from other animals.

In what has been said we are not to be understood as holding that the shipper and the carrier cannot make a binding agreement as to the value of property about to be shipped. We hold, however, that the agreement, stating values, must be a fair one, and it cannot be fair, if the value fixed is unreasonably below the market value, as, for example, at one-half or one-third the market value. Such stipulations are mere pretended agreed valuations, while in fact they are but a cloak for a limitation of the carrier's liability for negligence. Such an agreement may be valid as against the carrier's liability for other than negligence, but it cannot be held valid against that liability. *U. S. Express Co.* v. *Bachman*, 28 Ohio St., 144.

It may be insisted that where there is a distinct agreement as to values it would be recognized, and enforced by the court, no matter how great the disproportion between such valuation and the market value of the

property, and that a decision to the contrary is an invasion of the right of contract; that parties have the right to make their own contracts when they are *sui juris,* and they need no supervision on the part of the courts. The same argument may be made in behalf of a contract by the carrier against his own negligence, yet the policy of the law, as held by the overwhelming weight of authority, will not tolerate such contracts, no matter how great the solemnity with which they are made, and, we may add, no matter under what disguise they may appear. No one could doubt, if a contract were made valuing all horses shipped at $5 per head, and all cattle at $1 per head, and providing that in case of loss by the negligence of the carrier settlement should be made on that basis, that such contract was a mere cloak to protect the carrier against the consequences of his negligence, and this result could not be changed, no matter how many authorities were accumulated holding that such contracts were admissible. They would be admissible on the theory that the carrier may contract against his own negligence, but on no other. The same result must logically follow where there is any great departure from the market value. The difference is only one of degree. When such departure is very great, it is conclusive evidence that the contract was not a *bona fide* one for the ascertainment of values, but one against negligence. The rule indicated is not a hard one against the carrier, in favor of the shipper, but only justice to both. The carrier obtains much by these special contracts, as may be perceived by the form

Railroad v. Smith.

copied into this opinion, aside from any agreement at all as to value. He is relieved of his duty of insurer of the goods, and, as held by the authorities, the burden of proof is cast upon the shipper, in case of loss, to show negligence.

From the foregoing observations, it is perceived that we adhere to *Railroad* v. *Stone & Haslett,* supra.

We have not deemed it necessary to consider the question whether the making of the contract in Kentucky would require us to enforce it, on the theory of comity, because it seems such contracts are not enforceable in that State (*Railroad* v. *Graves,* 52 S. W., 961; *Adams Express Co.* v. *Walker,* 119 Ky., 121, 83 S. W., 106, 67 L. R. A., 412); and also because we deem it against public policy to enforce such contracts where the valuations contained therein are so far below the market value at the time and place of shipment, as shown by the evidence in the present case.

Our conclusion is there is no error in the judgment of the court of civil appeals, and it must be affirmed.