**PEERLESS WALL AND WINDOW COVERINGS, INC., Plaintiff,**

v.

**SYNCHRONICS, INC., a Tennessee Corporation, Defendant.**

No. CIV. A. 98–1084.

United States District Court, W.D. Pennsylvania.

Feb. 25, 2000.

David J. Manogue, Joseph N. Kravec, Specter, Specter, Evans & Manogue, for Plaintiff.

Kerry A. Kearney, Frederick H. Colen, Roy W. Arnold, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Defendant.

## MEMORANDUM OPINION AND ORDER

D. BROOKS SMITH, District Judge.

This case is a putative class action involving the so-called "Y2K problem"[1] in a massmarketed business software package. Plaintiff has filed this suit alleging breach of contract, express and implied warranties, fraud and negligent misrepresentation. Presently before the court is defendant's motion for summary judgment, dkt. no. 51.[2] For the following reasons, I will grant the motion and enter summary judgment for defendant.

### I.

The facts are undisputed. Plaintiff Peerless Wall & Window Coverings, Inc. is a small, Pittsburgh-based retail business owned and operated by Michael Lando, an experienced, Harvard-educated lawyer currently practicing law as a nonequity partner in one of the city's major firms, and his wife, Fran Lando, who handles the day-to-day operations of the business. Dkt. no. 54, exh. 2, at 4, 8, 12. In late 1993, Peerless wished to acquire computer software that would run the cash registers in its several stores, manage inventory and

link the stores together electronically. It sought proposals from two local concerns, Alpern Rosenthal Consulting and Roth Computer Register Company; both recommended "Point of Sale V6.5" software produced by defendant, Synchronics, Inc. *Id.* at 161. Plaintiffs were given sales literature prepared by Synchronics about its Point of Sale software. This literature contained a number of representations, among them:

> With SYNCHRONICS Point of Sale and related software, you'll **stay up-to-date**. Every minute. Every day. Automatically. It's that simple.
>
> . . . . .
>
> Synchronics introduced point-of-sale software for retailers in 1986. Since then, SYNCHRONICS Point of Sale has been installed in more than 15,000 businesses worldwide. And this number is growing every day!
>
> . . . . .
>
> Best of all, you can tailor SYNCHRONICS software to meet your specific needs. And it will continue to meet those needs as you increase sales, expand your business or add locations.

Dkt. no. 56, exh. A (Goldstein dep. exh. 2, at PL0338).

Roth's proposal was significantly less expensive, and, cost being the major concern of Peerless, it retained Roth to procure a package of hardware and Synchronics "Point of Sale V6.5" software to run in

---

**1.** This refers to the inability of certain computer software to accurately process dates after December 31, 1999. Other names for this malady include "year 2000 computer bug" and "millennium bug." *See generally* Jeff Jinnett, *Legal Issues Concerning the Year 2000 Computer Problem*, 506 PLI/Pat 103 (Feb.1998), *subsequently modified in Legal Issues Concerning the Year 2000 Computer Problem: An Awareness Article for the Private Sector* (1998) *<http://www. llgm.com/firm/article1.htm>* (visited Feb. 21, 2000); Jack E. Brown, *The Year 2000 Litigation: Focusing on the Issue of Cost* (1998) *<http://www.lawhost.com/ lawjournal/98spring/y2k.html >* (vis-

ited Feb. 21, 2000); D. Brooks Smith, *The Managerial Judge and Y2K Litigation*, 18 Rev. Litig. 403 (1999), and other articles contained in same symposium issue. For an interesting article on the Y2K problem written by a current computer law attorney who formerly was a computer programmer as far back as 1969, see Mark A. Murtha, *The Law of Y2K: An Introduction*, 17 Temp. Envtl. & Tech. L.J. 1 (1998).

**2.** Also ripe for adjudication is defendant's motion for sanctions and to compel expert discovery, dkt. no. 46.

Peerless' PC–DOS environment. Dkt. no. 54, exh. 2, PL0244–46. No one from Peerless had any contact with Synchronics in making this decision. Dkt. no. 54, exh. 2, at 123–24. Moreover, at the time of the purchase, plaintiff had no knowledge that the "year 2000 problem" even existed, much less expressed any desire that the software it acquired be Y2K-compliant. *Id.* at 83–87, 210–11. For that matter, there is no evidence on this record that Y2K-compliant software for plaintiff's application was commercially available. *Id.* at 83–87, 134.

Defendant Synchronics is also a small, closely-held corporation. Based in Tennessee, it develops and markets business applications software. Dkt. no. 54, exh. 1 (Goldstein aff.). It is owned and operated by Jeff Goldstein, and it employs about fifty people. *Id.* At the time Peerless was in the market for software, Synchronics was acting as a value-added reseller for the predecessor of RealWorld Corporation. *Id.* As such, Synchronics would take more-or-less generic RealWorld applications software and customize certain enhancements for particularized "niche" applications like those of plaintiff. *Id.* To accomplish this, Synchronics was required to obtain the RealWorld source code written in the COBOL programming language and write its own software that interfaced with the RealWorld code. Accordingly, Synchronics was forced to use data formats that were compatible with those already programmed by RealWorld, and thus the Point of Sale software, the earliest version of which was first released in 1986, followed this practice. *Id.;* dkt. no. 56, exh. A at 26, 29, 32, 35.

RealWorld software at that time used only a two-digit year field, storing only the last two digits and ignoring those representing the century and millennium. Thus, 1999 would be stored as "99," 2000 as "00" and 2001 as "01." Unfortunately, this meant that when the twentieth century ended, all subsequent dates would be interpreted essentially as falling in the early part of that century, meaning that 2001 would be mistaken for 1901. *See* dkt. no. 56, exh. A at 65. Nevertheless, this was a commonly used programming convention, dating from the early years of computing when memory was orders of magnitude more expensive than it is today, and persons involved in data processing generally ignored the fact that the convention that saved money then would wreak havoc later.[3] In any event, Synchronics was forced by the design of the RealWorld software to emulate its two-digit year storage rather than employ a four-digit year field, which no doubt would have been the better practice. As a result, the Point of Sale V6.5 software that plaintiff acquired from it in 1994 was not Y2K compliant.

Meanwhile, Synchronics was concerned that RealWorld, for reasons unrelated to any issue in this case, would stop licensing source code to it and essentially cut the rug out from under what had become a profitable business for Synchronics. Indeed, this concern would be realized at the end of 1995 when RealWorld terminated Synchronics' license. Dkt. no. 54, exh. 1, at 3. Synchronics therefore embarked in December 1993 upon a campaign to develop its own software from scratch that would compete against the RealWorld offerings. Dkt. no. 56, exh. A at 61. At that point, Synchronics was no longer constrained by the compatibility issues that had previously forced it to use two-digit year fields, and, aware of the Y2K date rollover problem, decided to use four-digit fields instead and make the software Y2K-compliant. *Id.* at 62, 75. In addition, it designed its new software packages to run under Microsoft Windows instead of PC–

---

**3.** Indeed, COBOL programming texts of two decades ago implicitly taught the use of two-digit year fields without so much as a passing reference to the implications of the date rollover that would take place at the end of the twentieth century. *See, e.g.,* Peter Abel, *COBOL Programming: A Structured Approach* 63, 126, 140–42 (1980); Mike Murach, *Standard COBOL* 62–63, 142–43 (1975).

DOS. This new offering was named Counterpoint, dkt. no. 56, exh. A at 61, and went to market in December 1995, *id.* at 75. At the end of that year, with the RealWorld license terminated and without further lawful access to the source code, Synchronics stopped supporting Point of Sale V6.5.

The Point of Sale V6.5 software was licensed pursuant to a "shrink-wrap" agreement printed on and occupying substantially all of both sides of the sealed envelopes containing the diskettes; this license, by its terms, indicated that opening the envelope would act as an acceptance. In pertinent part, it read (formatting slightly altered from original):

### READ THIS FIRST

*You should carefully read the following terms and conditions before opening this diskette envelope. Opening this envelope indicates your acceptance of these terms and conditions. If you do not agree with the license below, do not open this envelope. Return the entire package to your supplier for a refund.*

If you accept the terms and conditions below, complete the Software Registration Information card found in your User Manual. . . .

### LIMITED WARRANTY ON DISKETTES AND USER MANUAL

Synchronics warrants the diskettes and User Manual to be free from defects in materials and workmanship under normal use for 90 days after the date of original purchase. If during this period you discover a defect in the diskette(s) or User Manual you may return it to your supplier for a free replacement. This is your sole remedy in the event of such defect(s).

No Synchronics Distributor or Dealer is authorized to make any modification, extension, or addition to this warranty on behalf of Synchronics or its Licensors.

All implied warranties on the documentation and diskettes, including implied warranties of merchantability and fitness for a particular purpose, are limited in duration to 90 days from the date of the original purchase. . . .

### LIMITATIONS ON WARRANTY AND LIABILITY

Except as expressly provided above for diskettes and user manual(s), Synchronics, its Licensors, Distributors, and Dealers make no warranties, either express or implied, with respect to the Software, its merchantability, or its fitness for any particular purpose. *The Software is licensed solely on an "as is" basis.*

The entire risk as to the quality and performance of the Software is with you. Should the Software prove defective, you assume the entire cost of all necessary servicing, repair or correction, and any incidental or consequential damages.

In no event will Synchronics, its Licensors, Distributors, or Dealers be liable for any damages, including loss of data, loss of profits, or direct, indirect, incidental, special, or consequential damages resulting from any defect in the software, even if they have been advised of the possibility of such damage.

### TERM

This license is effective for the useful life of the software. . . .

### GENERAL

. . . . .

C. This is the complete and exclusive statement of the agreement between you and Synchronics, and this Agreement supersedes any prior agreements or understanding, oral or written, with respect to the subject matter of this agreement.

Dkt. no. 54, exh. B to exh. 1. This language was also contained in the user manuals

provided to plaintiff, dkt. no. 54, exh. 2, dep. exh. 6 at PL1273–74, and plaintiff saw those terms. In addition, the user manual specifically recited that

> Synchronics makes no warranties or representations with respect to the information contained herein; and Synchronics shall not be liable for damages resulting from any errors or omissions herein or from the use of the information contained in this manual.

Dkt. no. 54, exh. 2, dep. exh. 6 at PL1272. Although no Peerless employee opened any of the diskette envelopes because the software installation was performed by Roth, Fran Lando did sign and mail to Synchronics a software registration form in which she acknowledged that she read and understood the above agreement and agreed to its terms and conditions. Dkt. no. 54, exh. D to exh. 1; exh. 3, at 85–86.[4]

The user manual makes no reference to Y2K-compliance as an issue, nor does it make any express representation of how the software would handle dates after December 31, 1999. In one section on how the user should enter dates, however, it recites:

> Type dates in the format MMDDYY (6 numeric digits, with no slashes). For example, for "October 9, 2005", type 100905. The date will automatically be redisplayed in the format "MM/DD/YY" (with the slashes). Dates are checked to make sure that the month and the day are valid.

Dkt. no. 56, exh. A (Goldstein dep. exh. 5, at SYN00839). Mr. Goldstein, when questioned about this portion of the manual, admitted that it gave a misleading impression of the capabilities of the V6.5 software because the software would not recognize whether "05" referred to 2005 or 1905. Dkt. no. 56, exh. A at 188–92. Mr. Lando, however, admitted that he did not receive the manual until after the software was purchased and hence he did not rely on any of the above language, nor did the language form any part of the contract[5] for the software. Dkt. no. 58, exh. 6, at 301, 304, 310.

From all that appears from the record, the Point of Sale V6.5 software was installed and, after some early issues were resolved, the software ran successfully on plaintiff's computers thereafter. In March 1997, however, Fran Lando and another Peerless employee attended a Synchronics "dog-and-pony show" in which Goldstein apprized them personally that Point of Sale V6.5 was not Y2K-compliant and that Peerless should purchase Counterpoint. Dkt. no. 54, exh. 3, at 108–10; dkt. no. 56, exh. A at 85–86. Nevertheless, even after receiving this information, plaintiff acquired a Novell networking system (version 3.12) without inquiring whether it was compliant (it turned out in retrospect not to be). Dkt. no. 54, exh. 4.

■ Sometime after learning of the Y2K-noncompliance of Point of Sale V6.5, plaintiff demanded that Synchronics provide it with a free upgrade to Counterpoint. When Synchronics refused, plaintiff instituted this class action litigation on June 19, 1998,[6] with jurisdiction based upon diversity of citizenship.[7] Subsequently, Synchronics developed a free up-

---

**4.** Mrs. Lando claimed not to have read the language acknowledging and assenting to the software license agreement, but admitted that she did sign it. Dkt. no. 54, exh. 3, at 86.

**5.** This testimony was over plaintiff's counsel's objection that the question called for a legal conclusion. Aside from the fact that Mr. Lando is a practicing attorney and would not have been expressing a layman's opinion in any event, I interpret this statement to mean that Lando simply did not consider anything in the manual to be a term of the "deal" between Peerless and Synchronics.

**6.** On July 20, 1999, Congress enacted the "Y2K Act," P.L. 106–37, 113 Stat. 185, *codified at* 15 U.S.C. §§ 6601–6617. By its own terms, it applies only "to any Y2K action brought after January 1, 1999." 16 U.S.C. § 6603(a). Accordingly, it has no applicability here.

**7.** The parties do not address in these motions how the jurisdictional amount of $75,000 is met, but the complaint indicates that plaintiff is alleging as actual damages "the cost of replacing, modifying or upgrading the computer software purchased from Synchronics

grade patch to correct the year 2000 problem, a software program which it called Point of Sale V6.6/Y2K.[8] Dkt. no. 56, exh. A at 172, 175–76. Plaintiff has had the opportunity to test this patch, but has not yet chosen to install it on its computers. Indeed, as of his May 6, 1999 deposition, Mr. Lando admitted that Peerless had done nothing to become Y2K-compliant, dkt. no. 51, exh. 2, at 96–97, despite having been advised to do so the previous year by his own consultant, *id.* at 104–05.

During the course of pretrial motions practice, I denied class certification without prejudice pending discovery on non-class issues. Dkt. no. 25. Defendant has moved for summary judgment, dkt. no. 51, which motion is fully briefed and ripe for adjudication. As of the date of those briefs filed late in 1999, plaintiff admits it has suffered no damages, *id.* at 12, and there has been no supplemental submission by way of affidavit or otherwise to indicate to the contrary.

## II.

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the nonmoving party bears the burden of persuasion at trial, the moving party must show that the nonmoving party's evidence is insufficient to carry that burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party can create a genuine issue of material fact by pointing to evidence in the record sufficient to support a jury verdict in its favor at trial. *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir.1995). Alternatively, "the burden on the moving party may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548 (internal quotation marks omitted). "[S]ince a complete failure of proof concerning an essential element," *id.* at 323–24, 106 S.Ct. 2548, on which a party bears the burden of proof at trial establishes that the moving party is "entitled to a judgment as a matter of law," the nonmoving party must establish

and the attendant computer hardware so that it will function...." Dkt. no. 1 ¶ 4. It is difficult to understand how, given that Peerless has only a handful of stores and the upgrade to the Y2K-compliant Counterpoint software costs $1,500–$2,000, dkt. no. 56, exh. A at 133, the jurisdictional amount can be met on these damages. One is hard-pressed to conceive of a legal theory upon which Synchronics could be held responsible for the costs of upgrading plaintiff's DOS-based, noncompliant computers. Indeed, as of the time these briefs were filed, plaintiff had suffered no actual damages at all and relied on the availability of rescission and nominal damages to avoid summary judgment. Dkt. no. 55, at 13. Nevertheless, plaintiff makes the demand—ubiquitous in these cases—for punitive damages on its fraud claim. Because I cannot say as a matter of legal certainty that such an award of punitives was absolutely foreclosed at the time the complaint was filed, I conclude that the jurisdictional amount is met. *Compare Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1045–46, 1048 (3d Cir.1993) (dismissing diversity-based class action because class representative relied on punitive damages against a trustee to reach jurisdictional amount, and, as a matter of state law, punitive damages could not be recovered against a trustee under any circumstances) *with Carlough v. Amchem Prods., Inc.*, 834 F.Supp. 1437, 1460–62 (E.D.Pa.1993) (punitive damages properly counted where it could not be determined with legal certainty that they could not be awarded).

8. To develop a successful V6.5/Y2K patch Synchronics was required to modify the underlying RealWorld code as well as its own. It is not clear whether RealWorld gave its consent for Synchronics to do this. Dkt. no. 54, exh. 1 (Goldstein aff.); dkt. no. 56, exh. A at 208–10. Of course, this modification meant that V6.5/Y2K data files would no longer be compatible with standard RealWorld V6.5 files. Apparently this was no concern to Synchronics, which viewed both products as obsolete; indeed, as of Mr. Goldstein's August 19, 1999 deposition, only about ten users had downloaded the Y2K-compliant software out of an installed base of approximately 1,000, dkt. no. 56, exh. A at 132, 180, even though its free availability had been posted on Synchronics' website.

the existence of every element essential to its case. *Id.* Such evidence must be significantly probative and more than "merely colorable." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994).

Once the moving party has satisfied its burden, the nonmoving party is required by Fed.R.Civ.P. 56(e) to establish that there remains a genuine issue of material fact. *Clark v. Clabaugh,* 20 F.3d 1290, 1294 (3d Cir.1994). The nonmovant "may not rest upon mere allegation or denials of [its] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law[,]" *id.* at 248, 106 S.Ct. 2505,[9] and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 257, 106 S.Ct. 2505.

In determining whether a nonmovant has established the existence of a genuine issue of material fact requiring a jury trial, the evidence of the nonmovant must "be believed and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. 2505. Whether an inference is justifiable, however, depends on the evidence adduced. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 595–96, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment. *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990). Likewise, "simply show[ing] that there is some metaphysical doubt as to the material facts" does not establish a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348.

**9.** The parties agree that Tennessee law applies in the case *sub judice,* but disagree whether it differs in any material respect from that of Pennsylvania. I will treat the two bodies of law as interchangeable (especially

## III.

### A. WARRANTY

■ As stated *supra,* the software plaintiff acquired was distributed pursuant to a license agreement printed on the diskette envelopes and in the user manuals. The recent weight of authority is that "shrink-wrap" licenses which the customer impliedly assents to by, for example, opening the envelope enclosing the software distribution media, are generally valid and enforceable. *See Hill v. Gateway 2000, Inc.,* 105 F.3d 1147, 1150 (7th Cir.1997) (Easterbrook, J.); *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1452 (7th Cir.1996) (Easterbrook, J.); *M.A. Mortenson Co. v. Timberline Software Corp.,* 93 Wash.App. 819, 970 P.2d 803, 809–811, *review granted,* 138 Wash.2d 1001, 984 P.2d 1033 (1999); *Paragon Networks Int'l v. Macola, Inc.,* No. 9–99–2, 1999 WL 280385, *4 (Ohio App.Ct. Apr. 28, 1999) (unpublished). *But cf. Step–Saver Data Sys., Inc. v. Wyse Technology,* 939 F.2d 91, 95–106 (3d Cir. 1991) (analyzing enforceability of license under U.C.C. § 2–207 as a "battle of the forms" problem and finding license unenforceable because of prior conduct and manifested expectations of the parties).[10] As Judge Easterbrook insightfully opined:

> Vendors can put the entire terms of a contract on the outside of a box only by using microscopic type, removing other information that buyers might find more useful (such as what the software does, and on which computers it works), or both.... Notice on the outside, terms on the inside, and a right to return the software for a refund if the terms are unacceptable ... may be a means of doing business valuable to buyers and sellers alike.... Transactions in which the exchange of money precedes the communication of detailed terms are

with respect to the contract claims under the U.C.C.) unless the difference is significant.

**10.** Neither party contends that *Step–Saver* is controlling here.

common.... [C]onsider the software industry itself. Only a minority of sales take place over the counter, where there are boxes to peruse.... On Zeidenberg's arguments, these unboxed sales are unfettered by terms—so the seller has made a broad warranty and must pay consequential damages for any shortfalls in performance, two "promises" that if taken seriously would drive prices through the ceiling and return transactions to the horse-and-buggy age.... A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance.... Nothing in the UCC requires a seller to maximize the buyer's net gains. [Indeed], adjusting terms in buyers' favor might help Matthew Zeidenberg today (he already has the software) but would lead to a response, such as higher prices, that might make consumers worse off.

*ProCD*, 86 F.3d at 1451–53 (citation omitted). Arguably, the instant dispute might be distinguishable, for two reasons. First, Roth personnel opened the diskette envelopes and Peerless never had a chance to reject the terms of the license, although perhaps this is resolvable on traditional agency principles. Second, even if Mr. Lando himself had opened the envelopes, it is possible that the delay or cost occasioned by returning the software and obtaining an alternative product imposed unreasonable "switching costs" that would make enforcement of the license agreement inefficient. *See Hill*, 105 F.3d at 1150 (considering in dictum the effect of the buyer's cost of returning a computer system when the contractual terms enclosed in the shipping box proved unacceptable); *Step–Saver*, 939 F.2d at 102 (stating as part of § 2–207 analysis that party may have invested so much "time and en-

ergy in reaching this point in the transaction" that it is deterred "from returning the item").

I need not rely on the validity of the shrink-wrap license agreement, however, because Fran Lando signed the software registration form on which was a recitation that she had read and agreed to the license terms. Mrs. Lando claims never to have seen this recitation, but it is so well-settled as to be axiomatic that a competent person who signs a document but fails to read it is nevertheless bound by its terms. *E.g., Zawikowski v. Beneficial Nat'l Bank*, No. 98–2178, 1999 WL 35304, *2 (N.D.Ill. Jan.11, 1999) (citing *Hill*, 105 F.3d at 1148); *Teague Bros. v. Martin & Bayley, Inc.*, 750 S.W.2d 152, 158 (Tenn.Ct.App. 1987); *Louisville & N. R. Co. v. Smith*, 123 Tenn. 678, 134 S.W. 866, 871 (1911). Thus, I conclude that the software license is enforceable. *See Earl Brace & Sons v. Ciba–Geigy Corp.*, 708 F.Supp. 708, 710 (W.D.Pa.1989).

That license specifically excludes, in a section set off by large, bold type entitled "LIMITATIONS ON WARRANTY AND LIABILITY," the implied warranties of merchantability and fitness, except for the diskettes and user manual, which an earlier portion of the agreement specifically limits to ninety days. Both sets of language, which are such that "attention can reasonably be expected to be called to" them, are clear, conspicuous, and therefore operational. *Id.* (applying U.C.C. § 1–201(10) cmt. 10); *accord New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 387 Pa.Super. 537, 564 A.2d 919, 924 (1989); *Board of Directors of City of Harriman Sch. Dist. v. Southwestern Petro. Corp.*, 757 S.W.2d 669, 675 (Tenn.Ct.App.1988).[11] Thus, I conclude that all implied warranties were validly disclaimed or, in the case of the diskettes

---

11. In a half-hearted argument made briefly in a footnote, plaintiff relies on *Harriman* for the proposition that the warranty disclaimer was not sufficiently conspicuous. Dkt. no. 55, at 17–18 n. 2. But there, the disclaimer was buried on the back of a form, in very small type, and with a heading that merely read "Conditions." 757 S.W.2d at 674. *Harriman*, therefore, is distinguishable.

and user manual, temporally limited to a period long before plaintiffs discovered any basis for complaint about the software.

█ The license agreement limits the duration of any warranty—whether express or implied—to ninety days, and to the diskettes and user manual only. There is nothing legally objectionable about such a temporal limitation. *See Against Gravity Apparel, Inc. v. Quarterdeck Corp.,* 699 N.Y.S.2d 368, 369 (N.Y.A.D.1999), *aff'g* 2 Mealey's Year 2000 Report C1, C3–C6 (N.Y. Sup.Ct., N.Y. County 1999) ("Courts have routinely upheld 90–day warranties on computer software and hardware.") (citing cases); *Paragon Networks,* 1999 WL 280385 at *3; *see generally Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 202–04 (3d Cir.1995) (limitation of liability clauses in general and "not disfavored under Pennsylvania law[ ]"). Moreover, this is a much more restrictive warranty than plaintiff realizes. As to the diskettes, it must be read *in pari materia* with the following language printed further down in the license:

The entire risk as to the quality and performance of the Software is with you. Should the Software prove defective, you assume the entire cost of all necessary servicing, repair or correction, and any incidental or consequential damages.

Read together, these two terms conclusively demonstrate that the warranty on the diskettes can only be construed as a media warranty, not a software warranty. In other words, if one or more of the distribution disks containing the software were unreadable and plaintiff could not load the software onto its computers, plaintiff could obtain a free set of replacement diskettes containing the same software in readable form within ninety days of purchase. On the other hand, if the software contained on those diskettes, while machine-readable, proved defective, under the express terms of the agreement, plaintiff would bear the sole risk of such a condition and there would be no warranty coverage.

Likewise, as to the user manual, the warranty also runs only to the media and not to its content. In the manual itself appears the following language:

Synchronics makes no warranties or representations with respect to the information contained herein; and Synchronics shall not be liable for damages resulting from any errors or omissions herein or from the use of the information contained in this manual.

Read in conjunction with the ninety-day warranty, again, the only rational conclusion is that while the user may obtain a new user manual if, for example, its binding falls apart within three months after the software is acquired, there is no warranty if information contained within that manual turns out to be inaccurate and causes damage.

█ The software license also contains a broad integration clause, which by its terms "is the complete and exclusive statement of the agreement ... [and] supersedes any prior agreements or understanding, oral or written, with respect to the subject matter of this agreement." It is beyond cavil that such clauses are enforceable, *see, e.g., Sunquest Information Sys., Inc. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 653–56 (W.D.Pa.1999) (Smith, J.); *Harrison v. Fred S. James, P.A.,* 558 F.Supp. 438, 442 (E.D.Pa.1983). Therefore, under the express terms of the integration clause, plaintiff's claims based upon the sales literature must fail because, at best, they created a prior written understanding or agreement. In addition, all of plaintiff's other express warranty claims must fail, for two reasons. First, they arose long after the ninety-day warranty period expired. Second, and more importantly, the inaccurate statement in the user manual-really an implication-that the software could process dates after 1999 is specifically excluded by the terms of the warranty printed in the manual itself.

█ Even if the integration clause did not bar the claims based upon the sales literature, they would fail on their merits.

Plaintiff argues that, based upon the statements contained therein, it expected that the software would last eight years, but there is no such representation anywhere in the sales literature. The statement that "[w]ith SYNCHRONICS Point of Sale and related software, you'll stay up-to-date. Every minute. Every day.. Automatically[,]" cannot reasonably be read as a promise that the software will function for eight years, or even past 1999. In context, it must be remembered that Point of Sale V6.5 was intended to track sales and inventory in a retail business. Thus, the term "up-to-date," particularly when modified by "every minute" and "every day" (but not "every year") cannot be interpreted as anything other than a promise that the user will stay up-to-date on the current affairs of his or her business, not as a promise of the useful life of the software. Likewise, the recitation that "Synchronics introduced point-of-sale software for retailers in 1986" cannot, even under the most strained interpretation, be interpreted to imply (in 1994, eight years after introduction) that the software could be expected to operate for *another* eight years, especially when the focus of the sentence was that, in those eight years, 15,000 users had purchased it. Finally, the statement that "SYNCHRONICS software ... will continue to meet [your specific] needs as you increase sales, expand your business or add locations" pertains only to the scalability of the software (that is, its ability to accommodate growth), not to its temporal life. No reasonable factfinder could find in favor of plaintiff on any of these three

statements, and the claims based upon them will be dismissed for this alternate reason as well.

■ Plaintiff argues that a single recitation in the license agreement, which states that "[t]his license is effective for the useful life of the software" but does not define "useful life," creates an ambiguity that permits the admission of parol evidence. That would be true, of course, in the absence of the integration clause, assuming that the above language created an ambiguity in the first instance. *See Resolution Trust Corp. v. Urban Redev. Auth.*, 536 Pa. 219, 638 A.2d 972, 975–76 (1994); *Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn.1985); *Rosenfeld v. Rosenfeld*, 390 Pa. 39, 133 A.2d 829, 834 (1957).[12] However, "[t]he parol evidence rule protects a completely integrated written contract from being varied or contradicted by extraneous evidence. . . ." *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 612 (Tenn. Ct.App.1990). Accordingly, plaintiff may not resort to parol evidence on the intended duration of the license to contradict either the express contractual exclusions of warranty on the performance of the software or the ninety-day limitation on the diskette and manual warranties. Alternatively, for present purposes the general phrase "useful life of the software" does not render ambiguous those specific exclusions and temporal limitations.[13] For this reason, plaintiff's reliance on the doctrine of *contra proferentem*, that is, that ambiguous contracts should be interpreted against their drafter, *see Betts v. Tom*

---

**12.** *Rosenfeld* does state that "[w]hen a contract is silent on its duration, parol evidence is always admissible ... to show whether the agreement was to endure for a reasonable time or for some particular period[,]" 133 A.2d at 834, but this does not help plaintiff. The license agreement specifically recites that it is to run "for the useful life of the software." This is not silence on the issue of duration, but an indication that the license runs for a commercially reasonable time. Arguably, that time has already passed due to obsolescence, discharging both parties obligations.

**13.** If, for example, the software were still working and defendant demanded that plaintiff cease using it and license an upgrade because the original license had expired, then of course "useful life" would be both ambiguous and the key in the case. It would be resolved, however, not by reference to what the parties represented to each other about the software's expected lifespan (which the parol evidence rule would exclude), but by whether the software was no longer commercially viable (probably by expert testimony).

*Wade Gin,* 810 S.W.2d 140, 143 n. 4 (Tenn. 1991); *Central Transp., Inc. v. Board of Assessment Appeals,* 490 Pa. 486, 417 A.2d 144, 149 (1980); *Black's Law Dictionary* 296 (5th ed.1979), is also misplaced.

Accordingly, I will dismiss all of plaintiff's contract and warranty claims.

## B. FRAUD

Plaintiff bases its fraud and negligent misrepresentation claims upon the statements recited *supra* from the sales literature, and upon the implication given by the user manual that the software could recognize and accurately process dates after 1999. These claims also fail.

### 1. The Integration Clause

 Initially, I must draw a distinction between fraud in the execution and fraud in the inducement. "Fraud in the execution applies to situations where parties agree to include certain terms in an agreement, but such terms are not included. Thus, the defrauded party is mistaken as to the contents of the physical document that it is signing." *Dayhoff, Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1300 (3d Cir. 1996). That is not the situation here. Rather, this is a case of alleged fraud in the inducement, which involves "allegations of ... representations on which the other party relied in entering into the agreement but which are contrary to the express terms of the agreement." *Id.*

 Under Pennsylvania law, parol representations that contradict the express language of a fully integrated contract are admissible only to show fraud in the execution, not fraud in the inducement. *Sunquest,* 40 F.Supp.2d at 653–56;[14] *accord Quorum Health Resources, Inc. v. Carbon–Schuylkill Comm. Hosp., Inc.,* 49 F.Supp.2d 430, 432 (E.D.Pa.1999); *Montgomery County v. Microvote Corp.,* No. 97–6331, 2000 WL 134708, *7 (E.D.Pa. Feb.3, 2000); *Armstrong World Indus.,*

*Inc. v. Robert Levin Carpet Co.,* No. 98–5884, 1999 WL 387329, *5 (E.D.Pa. May 20, 1999). Tennessee appears to have a similar rule, dating back at least three-quarters of a century. *See Litterer v. Wright,* 151 Tenn. 210, 268 S.W. 624, 624 (1925); *accord United Nat'l Real Estate, Inc. v. Thompson,* No. 01–A–01–9108–CV00269 2633, 1992 WL 69642, *4, *9 (Tenn.Ct.App. Apr.8, 1992) (unpublished) (discussing *Litterer*); *Lowe v. Gulf Coast Dev., Inc.,* No. 01–A–019010CH00374 7490, 1991 WL 220576, *6 (Tenn.Ct.App. Nov.1, 1991) (recognizing that, while fraud in the inducement is an exception to the parol evidence rule, "parties cannot use parol evidence to vary the terms of a written contract"). *Cf. Godwin Aircraft, Inc. v. Houston,* 851 S.W.2d 816, 821–22 (Tenn.Ct. App.1992) (fraud claim premised on representation of airworthiness permitted despite contract language that aircraft sold "as is, where is," but without integration clause); *Glanski v. Ervine,* 269 Pa.Super. 182, 409 A.2d 425, 429 n. 4 (1979) (similar, residential real estate). The *Litterer* court expressed the rule as follows:

> Parol proof of inducing representations to the making of a contract must be limited to matters not otherwise plainly expressed in the writing.... The fundamental distinction should be kept clearly in mind between the denied right to contradict the terms of the writing, and the recognized right without so doing to resist recovery thereon, or to rely upon matters unexpressed therein. The ultimate test is that of contradiction, which is never permissible.

268 S.W. at 624. Thus, I conclude that plaintiff's fraud claim, to the extent it is based upon affirmative misrepresentations, is barred by the integration clause as contrary to the express terms of the license agreement, in the same manner as the contract and warranty claims. *See Sunquest,* 40 F.Supp.2d at 656 (dismissing

---

**14.** In *Sunquest,* I synthesized the Pennsylvania jurisprudence on this distinction at considerable length. I cite that discussion, rather than rehearse it here.

fraud in the inducement claim as contrary to integrated contract).

### 2. Misrepresentations

██ Even if the integration clause did not bar plaintiff's fraud claims, the representations in the sales literature would still not be actionable. As stated *supra,* they make no specific promises concerning the expected useful life of the software or its ability to process dates after 1999. At most, these are statements of puffery— "exaggeration or overstatement expressed in broad, vague and commendatory language"—not examples of actionable fraud. *See Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939, 945 (3d Cir.1993). Such statements of the sellers opinion are merely "sales talk" and should be recognized as such by a reasonable buyer and appropriately discounted, not stretched into the basis for a class action lawsuit. *See id.; Step–Saver Data Sys., Inc. v. Wyse Technology,* 752 F.Supp. 181, 190 (E.D.Pa.1990), *rev'd in part on other grounds,* 939 F.2d 91 (3d Cir.1991);[15] *Forbis v. Reilly,* 684 F.Supp. 1317, 1321–22 (W.D.Pa.), *aff'd mem.,* 862 F.2d 307 (3d Cir.1988); *Huddleston v. Infertility Ctr., Inc.,* 700 A.2d 453, 461 (Pa.Super.1997); *Klages v. General Ordnance Equip. Corp.,* 240 Pa.Super. 356, 367 A.2d 304, 310–11 (1976). *Cf. Garrett v. Mazda Motors,* 844 S.W.2d 178, 181 (Tenn. Ct.App.1992) (statement that automobile had been "babied to death" "cross[ed] over the line between 'puffing' or 'sales talk' and actual misrepresentation" when "the car had been stolen and driven 10,000 miles by a thief").

Nor can the implication created by the date examples in the user manual be considered an express representation. It too is vague, stating only that the user can enter a date after 1999 and perhaps that the software will correctly display it in MMDDYY format on a video display or printed report. It does *not* promise that the software will process the date correctly with respect to other dates. Plaintiff's fraud claim based upon the user manual is better characterized as an omission claim that defendant should have disclosed that the software, while accepting these dates, would not process them accurately.

### 3. Omissions

██ "It is axiomatic, of course, that silence cannot amount to fraud in the absence of a duty to speak." *Sunquest,* 40 F.Supp.2d at 656; *accord Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 611–12 (3d Cir.1995); *In re Estate of Evasew,* 526 Pa. 98, 584 A.2d 910, 913 (1990); *Sevin v. Kelshaw,* 417 Pa.Super. 1, 611 A.2d 1232, 1236 (1992); *Patton v. McHone,* 822 S.W.2d 608, 614 (Tenn.Ct. App.1991). Such a duty does not arise without a confidential or fiduciary relationship between the parties generally; in a typical arms-length business relationship, absent one party's surrender of substantial control of his affairs to the other, there is no duty to disclose. *Sunquest,* 40 F.Supp.2d at 656 (quoting *Drapeau v. Joy Tech., Inc.,* 447 Pa.Super. 560, 670 A.2d 165, 172 (1996) (Beck, J., concurring)). In fact, "there is virtually no Pennsylvania case in which a defendant has been held to have a duty to speak when both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of the facts[ ]" "and ample access to legal representation." *Duquesne Light,* 66 F.3d at 612; *accord City of Rome v. Glanton,* 958 F.Supp. 1026, 1038 (E.D.Pa.), *aff'd mem.,* 133 F.3d 909 (3d Cir.1997).

---

15. While I agree with the statement of law expressed in *Step–Saver,* I question that court's application of the law to the facts of that case. There, the court found statements that a computer system could serve up to nine users and was compatible with certain other items of hardware and software to be subjective and therefore mere puffery. 752 F.Supp. at 190. To the contrary, these appear to be specific representations of existing fact, not mere opinion. The fact that information is technical and perhaps difficult for the layperson to understand does not make it subjective.

Tennessee, however, may have a broader doctrine. In *Perkins v. M'Gavock*, 3 Tenn. (Cooke) 415, 1813 WL 259, *2 (1813), that state's highest court held that "each party to a contract is bound to disclose to the other all he may know respecting the subject-matter materially affecting a correct view of it, unless common observation would have furnished the information." *Accord Simmons v. Evans*, 185 Tenn. 282, 206 S.W.2d 295, 296 (1947). A review of the Tennessee jurisprudence reveals, however, that these cases almost always involve the sale of real (usually residential) property [16] or the sale of used automobiles. *See Garrett*, 844 S.W.2d at 181; *Gray v. Boyle Investment Co.*, 803 S.W.2d 678, 683 (Tenn.Ct.App.1990). In those cases, the "seller's duty to disclose information concerning the condition of a product arises from its superior knowledge of the product." *Patton*, 822 S.W.2d at 614.

I believe the Tennessee courts might find the existence of a duty in a computer software case like this one, as the technical knowledge of the internal design of a software product, particularly a consumer product distributed only in machine-readable object code rather than human-readable source code, is committed entirely to the licensor. Yet, there are many design details within a software developer's exclusive knowledge, and the duty to disclose surely cannot arise as to each one of them, or transactions would become hopelessly bogged-down in minutiae not to mention possible loss of trade secrets as well. Rather, that duty can extend only to material information, information specifically requested by the customer, and information necessary to make an affirmative disclosure that would otherwise be a half-truth not misleading. *See id.* at 615–16.

Here, there is no evidence that the industry in general or plaintiff in particular was even thinking about Y2K com-

pliance in 1994, and there was certainly no request for such information. On the other hand, the use of date entry examples in the user manual with dates after 1999 does tend to imply that the system was designed to process those dates properly. If it does not, then there is a duty to expand on the implicit representation of compliance by stating that the software will not process later dates accurately. Thus, while the issue is close, I conclude that there was a duty to speak under Tennessee law.

### 4. Reliance

Nevertheless, misrepresentations and omissions are not actionable as fraud without reasonable reliance thereon. *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 403–04 (6th Cir.1997) (predicting Tenn. law and rejecting fraud-on-the-market in favor of actual reliance for common law fraud and negligent misrepresentation claims), *cert. denied*, 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998); *Wittekamp v. Gulf & Western Inc.*, 991 F.2d 1137, 1144–45 (3d Cir.1993); *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs.*, 951 F.2d 1399, 1411–12 (3d Cir.1991); *Speaker v. Cates Co.*, 879 S.W.2d 811, 816 (Tenn.1994); *Mellon v. Barre–National Drug Co.*, 431 Pa.Super. 175, 636 A.2d 187, 190 (1993); *Sevin*, 611 A.2d at 1236. Here, Mr. Lando admitted that he did not even receive the manual until after the software was purchased and hence did not rely on anything contained in it. Dkt. no. 58, exh. 6, at 301, 304, 310. Moreover, Fran Lando admitted that Y2K-compliance was not a factor in her decision to purchase Synchronics software. Dkt. no. 54, exh. 3, at 88–90.

Plaintiff urges that reliance should be presumed "where information material to the transaction was concealed by a positive misrepresentation and where the evidence shows that the deceived party would not

---

**16.** In Pennsylvania, residential property fraud cases tend to be *"sui generis* within that context and have no applicability when residen-

tial real estate is not involved." *Sunquest*, 40 F.Supp.2d at 655 (citing cases).

have entered the transaction if the truth had been disclosed." Dkt. no. 55, at 22–23. This is a fair, if perhaps tautological, statement of the law. *See Rowland v. Carriers Ins. Co.,* 738 S.W.2d 183, 185–86 (Tenn. 1987); *De Joseph v. Zambelli,* 392 Pa. 24, 139 A.2d 644, 647–48 (1958); *New York Life Ins. Co. v. Brandwene,* 316 Pa. 218, 172 A. 669, 671 (1934). When one would not have entered the transaction in the presence of full disclosure of a material fact or absent a misstatement of one, that person has obviously relied. But here, there is no evidence that plaintiff would not have acquired defendant's software in 1994 had it been disclosed that it was not Y2K-compliant.[17] Indeed, there is no evidence that any Y2K-compliant software for plaintiff's application was even on the market in 1994. Accordingly, reliance cannot be "presumed."

Accordingly, I will dismiss plaintiff's fraud claim.

## C. NEGLIGENT MISREPRESENTATION

 Plaintiff also seeks recovery on a negligence/negligent misrepresentation theory, which fails for the same reasons as the fraud claim. Given the contractual relationship between the parties, moreover, the economic loss doctrine bars this tort claim in favor of the well-founded view that parties in privity should look to the contract itself for their remedies. As the Third Circuit, predicting Pennsylvania law, opined:

> [W]here there is privity in contract between two parties, and where the policies behind tort law are not implicated, there is no need for an additional tort of negligent misrepresentation.... A party who engages in contractual negotiations with another has the ability to protect itself in the contractual language against the other party's innocent, though wrong representations.

*Duquesne Light,* 66 F.3d at 620;[18] *accord Valhal,* 44 F.3d at 207; *Sun Co. v. Badger Design & Constructors, Inc.,* 939 F.Supp. 365, 371–72 (E.D.Pa.1996); *Eagle Traffic Control v. Addco,* 882 F.Supp. 417, 419 (E.D.Pa.1995); *Palco Linings v. Pavex, Inc.,* 755 F.Supp. 1269, 1271 (M.D.Pa.), *adhered to on reconsideration,* 755 F.Supp. 1278 (M.D.Pa.1990) ("[T]ort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.... A buyer['s] ... desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects."); *PPG Indus. Inc. v. Sundstrand Corp.,* 681 F.Supp. 287, 289–91 (W.D.Pa.1988); *Carlotti v. Employees of Gen'l Elec. Fed. Credit Union,* 717 A.2d 564, 566–67 (Pa.Super.1998), *alloc. de-*

---

17. The testimony on which plaintiff asserts otherwise does not refer to the 1994 Point of Sale V6.5 transaction, but to the Novell system plaintiff purchased in 1997, after it had been informed of the Y2K problem. *See* dkt. no. 56, exh. B at 209–10, 218–19 (cited in dkt. no. 55, at 23).

18. This reasoning is not undermined by the fact that here, the license terms were imposed by Synchronics on a form license agreement, without bargaining. There is no evidence that Peerless objected to the terms or attempted to bargain over them. Moreover, if the term had turned out to be nonnegotiable, it would probably be because the risk to be insured against (damages flowing from a negligently made misstatement times *the probability of such an event*) was far *too* high to be absorbed at the price charged for the software, particularly when the costs of defending the litigation are added. This would appear to be a common situation in mass-market software, which could increase significantly in price if burdensome legal duties were found to exist. While that would benefit *some* customers (those willing to pay more to shift risk to the software developer), many others would be forced to forego the software entirely as uneconomic. The current robust market for such software, which is almost always licensed under limitation of liability clauses, indicates that the *ex ante* demand for software developer risk-bearing in the mass-market context is limited or non-existent, even though the *ex post* demand is, as shown by the filing of this case and others like it, extremely high. Unfortunately for plaintiffs, one cannot purchase fire insurance after a fire.

*nied,* 739 A.2d 163 (Pa.1999); *Spivack v. Berks Ridge Corp.,* 402 Pa.Super. 73, 586 A.2d 402, 405 (1990) ("The general rule of law is that economic losses may not be recovered in tort (negligence) absent physical injury or property damage."); *Lower Lake Dock Co. v. Messinger Bearing Corp.,* 395 Pa.Super. 456, 577 A.2d 631, 634–35 (1990); *Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 133 (Tenn. 1995) ("Tennessee has joined those jurisdictions which hold that product liability claims resulting in pure economic loss can better be resolved on theories other than negligence."). This is especially true when there is an integrated writing. *See Sunquest,* 40 F.Supp.2d at 651–56; *New York State Elec. & Gas,* 564 A.2d at 926 (fully integrated contract cannot be avoided by pursuing negligent misrepresentation theory).

█ There are two exceptions to the economic loss rule: one is fraud (that is, an *intentionally* false statement), and the other applies when "the defendant is in the business of supplying information for the guidance of others and makes negligent misrepresentations[.]" *Sunquest,* 40 F.Supp.2d at 658 (quoting Restatement (Second) of Torts § 552 (1977)); *Ritter,* 912 S.W.2d at 130–31; *John Martin Co. v. Morse/Diesel, Inc.,* 819 S.W.2d 428, 431 (Tenn.1991). I have already dealt with plaintiff's fraud claim, and the section 552 claim can likewise be disposed of in short order by simply pointing out that, unlike the investment banker in *Sunquest,* defendant, while it is a software developer in the *information systems* business, is not in the business of *providing information.*

In *Ritter,* plaintiff suffered damage to their crops after reading defendant's advertising and applying its pesticide. The court, however, held that their claim for economic loss was barred because the advertising did not show that defendant was "in the business of supplying information for the guidance of others[,]" as required by § 552. 912 S.W.2d at 131. More specifically, the court in *Walter Raczynski*

*Prod. Design v. IBM Corp.,* No. 92–6423, 1994 WL 247130 (N.D. Ill. June 6, 1994), held that a manufacturer/seller of computer hardware was not in the business of supplying information. *Id.* at *3. It opined:

> Even those businesses that provide products or services often provide operating instructions and warranty information, as well.... [D]efendants who provide such information are not, for that reason, "in the business of supplying information...." Any information supplied by the manufacturer [is] considered merely incidental to the sale of goods.... [C]omputer hardware and software manufacturers do not meet the definition of businesses engaged in providing information, against whom a negligent misrepresentation claim may be asserted.

*Id.* (citing cases; citations and some internal quotation marks omitted); *see generally Rankow v. First Chicago Corp.,* 870 F.2d 356, 363–64 (7th Cir.1989) (setting forth general principle and citing cases).

Accordingly, plaintiff's negligent misrepresentation claim must be dismissed.

### D. LACK OF DAMAGES

█ As an alternate basis for summary judgment, defendant asserts that its motion should be granted because plaintiff has suffered no actual damages. *See generally Brader v. Allegheny Gen'l Hosp.,* 64 F.3d 869, 878 (3d Cir.1995); *Kaufman v. Mellon Nat'l Bank & Trust Co.,* 366 F.2d 326, 331 (3d Cir.1966); *Corestates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.1999); *Ferry v. Fisher,* 709 A.2d 399, 402 (Pa.Super.1998). Indeed, the record indicates only that Mr. Lando stopped receiving his regular reports from the Synchronics software in June 1999, but there is no evidence why this happened sufficient to implicate the Y2K-noncompliance of the software as the culprit, nor is there any indication of monetary loss arising from the malfunction. Moreover, there has been no supplemental submission since the

beginning of the new century to indicate any subsequent malfunction or damage. Nevertheless, it is undisputed that the Point of Sale V6.5 software is not Y2K-compliant and thus will require replacement at some cost to Peerless.[19] Accordingly, I will not dismiss the contract claim on that basis. *See Barrack v. Kolea*, 438 Pa.Super. 11, 651 A.2d 149, 155 (1994) ("Damages are not speculative when they are certain in fact, even if uncertain as to amount."); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn.Ct.App.1999) (similar).

Plaintiff seeks nominal damages on its fraud claim, no doubt as a means of supporting a jury award of punitive damages. Under Pennsylvania authority, nominal damages are available as a remedy for fraud. *Sands v. Forrest*, 290 Pa.Super. 48, 434 A.2d 122, 124 (1981). Thus, this claim cannot be dismissed for lack of damages, either.

I reject, however, plaintiff's argument that it can satisfy the damage requirement by seeking rescission. Although this is an available remedy, *see Metropolitan Property & Liab. Ins. Co. v. Insurance Comm'r*, 525 Pa. 306, 580 A.2d 300, 302 (1990); *Richards v. Taylor*, 926 S.W.2d 569, 571–72 (Tenn.Ct.App.1996), plaintiff never tendered the software back to defendant and sought to recover the purchase price. This is fatal to a rescission claim in Pennsylvania. *Sunquest*, 40 F.Supp.2d at 662 (citing cases). Moreover, under Tennessee law, rescission is only granted "under the most demanding circumstances[,]" and is not permitted where, as here, an adequate remedy at law exists. *Richards*, 926 S.W.2d at 571–72.

### E. PROXIMATE CAUSATION

█ Finally, I address briefly defendant's other alternate ground for granting summary judgment, the argument that the noncompliance of the Sunquest software is not the proximate cause of any harm to Peerless because the rest of Peerless' computer system is itself noncompliant. All plaintiff must show, however, is that the defendant's acts or omissions were a "substantial factor" in bringing about plaintiff's harm. *Blum v. Merrell Dow Pharm., Inc.*, 705 A.2d 1314, 1316 (Pa.Super.1997), *alloc. granted*, 558 Pa. 597, 735 A.2d 1267 (1999); *Boling v. Tennessee State Bank*, 890 S.W.2d 32, 36 (Tenn.1994). Defendant's argument is akin to saying that the owner of an automobile with a defective transmission cannot recover against the company which made it because the brakes, engine and tires are defective as well, preventing the car from running in any event. This line of reasoning would permit not only the transmission manufacturer to evade liability, but those who made the engine, tires and brakes as well, even though the vehicle owner was entitled to have his car run properly again. Accordingly, I reject defendant's proximate causation argument.

### IV.

For the foregoing reasons, I will grant defendant's motion for summary judgment and dismiss plaintiff's claims with prejudice. An appropriate order follows.

### ORDER

AND NOW, this twenty-fifth day of February 2000, upon consideration of defendant's motion for summary judgment, dkt. no. 51, defendant's motion for sanctions and to compel expert discovery, dkt. no. 46, and the responses thereto, it is hereby ORDERED and DIRECTED that:

1. defendant's motion for summary judgment, dkt. no. 51, is GRANTED;

2. defendant's motion for sanctions and to compel expert discovery, dkt. no. 46, is DENIED AS MOOT;

---

**19.** Even if the "free" Y2K upgrade provided by defendant functions properly and is installed, plaintiff will still incur costs in installing it, even if those costs involve only the time of its personnel or those of a contractor.

3. the Clerk of Court shall mark the above-captioned civil action CLOSED.