2016 PA Super 107

| | |
|---|---|
| ALLEN-MYLAND, INC. AND LARRY ALLEN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| GARMIN INTERNATIONAL, INC. AND WINNER AVIATION CORPORATION | |
| Appellees | No. 1078 EDA 2015 |

Appeal from the Order Dated March 30, 2015
In the Court of Common Pleas of Delaware County
Civil Division at No: 2013-005759

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and STRASSBURGER,[*] JJ.

OPINION BY STABILE, J.:                    **FILED MAY 24, 2016**

Appellant, Allen-Myland, Inc. ("AMI"), appeals from the March 30 2015 order granting the motion for compulsory nonsuit of Appellees, Garmin International, Inc. ("Garmin") and Winner Aviation Corporation ("Winner," and together with Garmin, "Appellees").  We reverse and remand.

AMI is a Pennsylvania corporation and Larry Allen ("Allen")[1] is its president and sole shareholder.  In the transaction underlying this litigation, Allen sought to update the analog avionics in AMI's Rockwell Commander

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  The record indicates that Allen was a named plaintiff in the original complaint but not in the amended complaint.  The parties have not amended the caption.

Twin Engine 980 aircraft ("the Aircraft"). AMI purchased the Aircraft new in 1980. The record indicates that the aviation industry has been moving toward digital avionics systems, and replacement parts for the Aircraft's original analog avionics are becoming difficult to find. The Aircraft's original avionics included a King KFC 300 autopilot system, which Allen did not intend to replace. Allen therefore wanted the updated digital avionics to be compatible with the analog KFC 300. Prior to the upgrade the Aircraft had an automatic altitude capture function, meaning the Aircraft's avionics system could automatically level the Aircraft and maintain a preselected altitude. Allen expected that the updated avionics would retain the automatic altitude capture function.

Winner is a Pennsylvania corporation offering, among other services, the sale and installation of avionics systems. Winner (and its corporate predecessor) performed all modification work on the Aircraft since 1982. Peter Quick ("Quick") is an avionics manager for Winner. In 2007 or 2008, Allen and Quick began discussing Allen's desire to update the Aircraft's avionics. Allen alleges he informed Quick that he wanted the new avionics to integrate fully with the Aircraft's existing avionics, including the KFC 300. In late 2009, Winner provided a written proposal to AMI for the purchase and installation in the Aircraft of two new G600 "glass cockpit" avionics systems manufactured by Garmin. The proposal included Winner's one-year express warranty covering parts and labor. The proposal did not address

automatic altitude capture. The proposed price was $150,000.00. AMI accepted the proposal and made a down payment of $80,000.00.

In August of 2010, the G600 avionics units arrived at Winner. Allen flew the Aircraft to Winner's facility in Youngstown, Ohio and left it for installation of the G600 units. At that time, Winner provided Garmin's pilot's guide for the avionics systems. The pilot's guide contained Garmin's express warranty and disclaimer of any implied warranty for the G600 systems. The pilot's guide did not expressly warrant that automatic altitude capture would continue to function as it did before installation of the G600 systems. Winner completed the installation in October of 2010, and invited Allen to conduct a test flight. Upon completion of the test flight, Allen informed Quick that automatic altitude capture was not functional. Instead, the Aircraft audibly alerts the pilot at 1,000 feet and 200 feet from the preselected altitude. Upon reaching the preselected altitude, the pilot must push a button to engage altitude capture.

Quick admittedly was surprised and asked one of Winner's technicians to check for an installation error. Finding no error in the installation, Quick called Garmin in Allen's presence. A Garmin representative stated that the G600 unit could not automatically communicate the automatic altitude capture command to the KFC 300 autopilot system, but Garmin planned to release a software update to resolve that issue. From 2010 to 2013, when Allen brought the Aircraft to Winner's facility for inspections and oil changes,

he inquired about the pending software update. Quick repeatedly informed Allen that Garmin was working on it. Allen eventually emailed Garmin and learned that Garmin abandoned plans for the software update. Allen alleges he will need to replace the Aircraft's autopilot system, at a cost of $90,000.00, to regain automatic, rather than push-button, altitude capture.

AMI filed suit in 2013 after learning that Garmin abandoned plans for the software update. AMI's amended complaint alleged causes of action against Appellees for fraud, breach of implied warranty, breach of express warranty, breach of contract, and unfair trade practices. Garmin filed preliminary objections, and the trial court sustained Garmin's objection to the unfair trade practices claim. After the close of discovery, Garmin filed a motion for partial summary judgment, and the trial court granted Garmin's motion on the fraud and breach of implied warranty causes of action.

The case proceeded to a December 14, 2015 bench trial at which AMI presented only Allen and Quick as witnesses. At the close of AMI's evidence, both Appellees moved for compulsory nonsuit pursuant to Pa.R.C.P. No. 230.1. The trial court granted the motions, thereby entering nonsuit on all causes of action against Winner and the remaining breach of express warranty and breach of contract causes of action against Garmin. The trial court entered a defense verdict on December 16, 2014. AMI filed a timely post-trial motion. The trial court heard argument on the post-trial motion on March 12, 2015 and entered an order denying relief on March 26, 2015. The

verdict was reduced to judgment on March 30, 2015, and this timely appeal followed.

AMI raises four issues for our review:

A. Whether in granting partial summary judgment to [Garmin] on [AMI's] claim of breach of implied warranty of fitness for a particular purpose, the trial court committed errors of law, abused its discretion, disregarded and/or disbelieved competent evidence and misinterpreted and misapplied the legal standards set forth in [Pa.R.C.P. No. 1035.2] where the record reflected material questions of fact to be determined at trial.

B. Whether in granting compulsory nonsuit in favor of [Winner] on [AMI's] claim of breach of implied warranty of fitness for a particular purpose, the trial court committed errors of law, abused its discretion, disregarded and/or disbelieved competent evidence and misinterpreted and misapplied the legal standards set forth in [Pa.R.C.P. No. 230.1(a)(2)] and related case law where [AMI] presented sufficient credible evidence to establish the necessary elements of the cause of action.

C. Whether in granting compulsory nonsuit in favor of [Winner] on [AMI's] claim of breach of express warranty, the trial court committed errors of law, abused its discretion, disregarded and/or disbelieved competent evidence and misinterpreted and misapplied the legal standards set forth in [Pa.R.C.P. No. 230.1(a)(2)] and related case law where [AMI] presented sufficient credible evidence to establish the necessary elements of the cause of action.

D. Whether in granting compulsory nonsuit in favor of [Winner] on [AMI's] claim of breach of contract, the trial court committed errors of law, abused its discretion, disregarded and/or disbelieved competent evidence and misinterpreted and misapplied the legal standards set forth in [Pa.R.C.P. No. 230.1(a)(2)] and related case law where [AMI] presented sufficient credible evidence to establish the necessary elements of the cause of action.

AMI's Brief at 5-6. AMI has abandoned the fraud and unfair trade practices claims against both Appellees, and AMI has abandoned all causes of action except breach of implied warranty against Garmin.

AMI's first argument challenges the summary judgment in favor of Garmin on AMI's cause of action for breach of implied warranty of fitness for a particular purpose. Rule 1035.2 of the Rules of Civil Procedure governs entry of summary judgment. Summary judgment is appropriate "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense [. . .]." Pa.R.C.P. No. 1035.2(1). The following standard governs our review:

> As has been oft declared by this Court, summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt.

> On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo.* This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010) (internal citations and quotation marks omitted).

The sole basis for Garmin's summary judgment motion was the disclaimer of implied warranties included in its Pilot's Guide. As noted above, AMI first received the pilot's guide when Allen delivered the Aircraft to Winner for installation. By that time, AMI accepted Winner's proposal and paid Winner $80,000.00. AMI argues the disclaimer is ineffective because it was not made a part of the parties' bargain and because it is not sufficiently conspicuous. The trial court rejected both arguments and entered summary judgment.

Section 2315 of Pennsylvania's Uniform Commercial Code governs implied warranties of fitness for a particular purpose:

> Where the seller at the time of contracting has reason to know:
>
> (1) any particular purpose for which the goods are required; and
>
> (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods;
>
> there is unless excluded or modified under section 2316 (relating to exclusion or modification of warranties) an implied warranty that the goods shall be fit for such purpose.

13 Pa.C.S.A. § 2315.

Section 2316, governing exclusion of warranties, provides in relevant part as follows:

> **(b) Implied warranties of merchantability and fitness.**--Subject to subsection (c), to exclude or modify the

- 7 -

implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

**(c) Implied warranties in general.**--Notwithstanding subsection (b):

(1) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the attention of the buyer to the exclusion of warranties and makes plain that there is no implied warranty.

(2) When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.

(3) An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

13 Pa. Pa.C.S.A. § 2316.

Both the implied warranty of merchantability and the warranty of fitness for a particular purpose arise by operation of law and serve to protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose. [. . .] The warranty of fitness for a particular purpose is more exacting. It requires that the seller had reason to know of the buyer's particular purpose at the time of contracting and that the buyer was relying on the seller's expertise. In that case, the goods are implicitly warranted to be fit for that particular purpose.

*Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d

Cir. 1992).

Here, AMI asserts an implied warranty that the digital Garmin G600 units would integrate fully with the aging analog KFC 300 autopilot and preserve all of the Aircraft's existing functionality, including automatic altitude capture. As noted above, Garmin won summary judgment based on its disclaimer in the pilot's guide. The parties' briefs confine their analysis to the effect of the disclaimer, and we will do the same.[2]

First, we consider AMI's argument that Garmin was too late in providing its disclaimer. AMI argues the disclaimer is ineffective because Garmin provided it only after AMI accepted Winner's proposal and paid an $80,000.00 deposit. AMI concludes the disclaimer is ineffective because Garmin introduced it after the parties—with Winner acting as Garmin's agent—finalized their agreement.

According to AMI, no court in Pennsylvania has addressed this issue, but many other jurisdictions have held warranty disclaimers to be ineffective where the seller introduces them after the bargaining is complete. Before

---

[2] We observe that AMI cannot prevail on this cause of action simply by negating the disclaimer. AMI still must prove Garmin had reason to know of a particular purpose for which AMI wanted the G600 units. The trial court, having found the disclaimer effective, did not consider whether AMI established any factual or legal basis for the existence of an implied warranty from Garmin. AMI, having lost the summary judgment motion, had no incentive or opportunity to develop the issue at trial. In connection with its other causes of action, AMI offered evidence that Winner acted as an agent for Garmin. The trial court issued no findings or opinion on that issue. In summary, the existence of an implied warranty is an issue for the trial court to address in the first instance on remand.

we turn to the law of other jurisdictions, we consider the language of § 2315. "Where the seller **at the time of contracting** has reason to know" of a particular purpose for the goods or of the buyer's reliance on the seller's skill or judgment in selecting goods, an implied warranty exists **unless the seller excludes or modifies it** in accord with § 2316. 13 Pa.C.S.A. § 2315 (emphasis added). Section § 2315 plainly provides that an implied warranty arises, if at all, at the time of contracting. We also believe § 2315 forecloses any possibility that a seller can unilaterally modify or exclude an implied warranty after the parties have completed the bargaining process and arrived at a final binding agreement. A contrary result would create contractual chaos. If an implied warranty arises at the time of contracting but the seller can disclaim it any time thereafter without the buyer's assent, the warranty is meaningless. The more difficult questions are when the bargaining process ends and whether the disclaimer was a part of it. On this point, we find instructive jurisprudence from federal courts and other states.

AMI cites *Hornberger v. General Motors Corp.*, 929 F. Supp. 884 (E.D.Pa. 1996), in which the lessees of an automobile brought suit for breach of implied warranty of merchantability against General Motors after the three-year/36,000 mile express warranty expired. The express warranty stated that any implied warranties would last only for the duration of the express warranty. *Id.* at 886. The plaintiffs received and signed the warranty booklet upon delivery of the vehicle, after they signed the lease

contract. *Id.* at 889. Plaintiffs alleged they had no notice of the warranty booklet and warranty disclaimers when they signed the lease contract. *Id.* at 888-89. The car's transmission failed at roughly 40,000 miles, and the dealer quoted $3,200.00 as the cost of repair. *Id.* Noting the absence of Pennsylvania law on point, the district court reasoned that the buyer and seller must be subject to negotiation and bargaining, so that the buyer is aware of the disclaimer when the parties form a contract. *Id.* at 889-90 (quoting *Horizons, Inc. v. Avco Corp.*, 551 F. Supp. 771, 779 (W.D.S.D. 1982)).

> For this reason, the prevailing rule is that a warranty limitation stated in printed matter given by the seller to the buyer after the sale is not binding. Likewise, when no disclaimer is made as a part of the oral sales contract, the buyer is not bound by a disclaimer which is stated in a clause of the printed warranty which is shipped or delivered to the buyer with the goods.

*Id.* The *Hornberger* Court denied summary judgment, finding a triable issue of fact on the disclaimer's validity. *Id.* at 890.

The *Hornberger* Court cited *Bowdoin v. Showell Growers*, 817 F.2d 1543 (11th Cir. 1987), wherein the Circuit Court held a disclaimer of implied warranties ineffective because it was not part of the basis for the parties' bargain. The warranty disclaimer was on the last page of an instruction manual the buyer did not receive until after it paid for the seller's machine and took delivery of it. *Id.* at 1544-45. The Eleventh Circuit wrote as follows:

> Under the Uniform Commercial Code as adopted by Alabama and virtually every other state, a manufacturer may disclaim the implied warranties of merchantability and fitness provided that the disclaimer is in writing and conspicuous, and provided that the disclaimer is part of the parties' bargain. If a disclaimer was conspicuous to the purchaser *before the sale,* a court will generally hold the disclaimer effective based on the assumption that the disclaimer formed a part of the basis of the bargain. If, however, the disclaimer was not presented to the purchaser before the sale, the court will hold such a disclaimer ineffective because it did not form a part of the basis of the bargain. This 'basis of the bargain' rule protects purchasers from unexpected and coercive disclaimers.

*Id.* at 1545 (italics in orginal).

AMI also relies on *Marion Power Shovel Co. v. Huntsman*, 437 S.W.2d 784 (Ark. 1969), in which the warranty disclaimer appeared in an operation manual provided to the buyer upon delivery of the seller's power shovel. Prior to delivery, the seller invoiced the buyer and the buyer paid in full. *Id.* at 785. The buyer allegedly chose the power shovel after touring his land with and explaining his needs to the seller's representative. *Id.* The Arkansas Supreme Court found the warranty disclaimer unenforceable because it was not made a part of the contract and because it was not sufficiently conspicuous. *Id.* at 787.

To summarize, in *Bowdoin* and *Marion*, the courts found the warranty disclaimer ineffective when the written disclaimer post-dated the parties' agreement and accompanied the delivered product. In other words, the bargaining process was complete before the seller issued the disclaimer. *Hornberger* found a triable issue of fact because the parties disputed

whether the automobile lease agreement put the buyer on notice of the warranty booklet—that is, it was possible the disclaimer was part of the parties' bargain. **Hornberger**, 929 F. Supp. at 889 n.5.

Garmin relies on several software cases to support its argument for the disclaimer's validity. In **Peerless Wall and Window Coverings, Inc. v. Synchronics, Inc.**, 85 F. Supp.2d 519 (W.D.Pa. 2000), the plaintiff small business sought to purchase software for its cash registers. In 1993, the plaintiff retained Roth Computer Register Company, and Roth procured a software package from the defendant. **Id.** at 522-23. The defendant provided software diskettes in a sealed envelope. Defendant printed its limited warranty and disclaimers on the outside of the sealed envelope. A paragraph titled "Read This First," advised that opening the envelope indicated acceptance of the terms and conditions printed on the sealed envelope. **Id.** at 524. That paragraph advised the user to return the package for a refund if the warranty terms and conditions were unacceptable. **Id.** Roth personnel opened the envelopes and performed the installation, but a principal of plaintiff signed a registration form indicating her awareness of and assent to the warranty. **Id.** at 525. Subsequently, the plaintiff learned the software was not "Y2K" compliant, as it recorded dates with two-digit rather than four-digit years. **Id.** Defendant apprised plaintiff of this issue in 1997, and advised purchasing new software. **Id.** Defendant refused plaintiff's demand for a free upgrade, and litigation

ensued. *Id.* The District Court noted that "shrink wrap" licenses of the kind at issue are generally enforceable. *Id.* at 527. The Court also noted that "[t]ransactions in which the exchange of money precedes the communication of detailed terms are common[.]" *Id.* (quoting *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1452 (7th Cir. 1996)). Furthermore, the plaintiff's principal signed a warranty registration card. The Court found the warranty enforceable. *Id.*

Garmin emphasizes the Eleventh Circuit's statement, in *ProCD*, that an exchange of money commonly precedes the seller's provision of detailed contractual terms. In *ProCD*, as in *Peerless*, the Court considered the effect of software licenses. The defendant bought the plaintiff's CD-ROMs containing the plaintiff's compilation of thousands of telephone directories. In violation of the license, which was encoded on the CD and created a screen message requiring the user to indicate acceptance, the defendant resold access to that information. *ProCD*, 86 F.3d at 1450, 1452. The software would not run if the user declined to accept the license terms. *Id.* at 1452. In finding the license enforceable, the Court wrote that "[n]otice on the outside, terms on the inside, and a right to return the software for a refund if the terms are unacceptable (a right that the license expressly extends) may be a means of doing business valuable to buyers and sellers alike." *Id.* at 1451.

The Court cited several transactions for which the exchange of money commonly precedes the exchange of detailed terms—purchase of insurance, where the insured makes a payment before receiving a copy of the policy; the purchase of an airline ticket, with small print terms on the ticket that can be rejected by cancelling the reservation; the purchase of a concert ticket, the back of which contains terms governing the attendee's behavior at the concert. *Id.* The Court also noted that consumer goods often come with a warranty printed on a leaflet inside the box, and that the consumer has no opportunity to read the warranty until completing a purchase and opening the box. *Id.* In each case, the buyer can accept the license by using the product or reject the license by returning it.[3]

_____

[3] The Third Circuit in **Step-Saver Data Sys., Inc. v. Wyse Technology**, 939 F.2d 91 (3rd Cir. 1991) took a slightly different approach to the question. There, the seller shipped to the buyer copies of the seller's software whenever the buyer called by telephone and asked for a copy. The buyer then installed the software on its customer's computers. The seller shipped the software in a box with a "box top license" stating that opening the box indicated the buyer's assent to its terms. *Id.* at 95-96. The box top license purported to be the parties' entire agreement, and it included a disclaimer of express and implied warranties. *Id.* at 96.

The Third Circuit analyzed the question under § 2-207 (titled "Additional terms in acceptance or confirmation") of the UCC. In essence the box-top license was "one more form in a battle of forms" whose terms were unenforceable absent the buyer's assent. *Id.* at 99-100. A representative of the buyer testified that he received seller's assurances that the license did not apply to the buyer, as the buyer was not the end user of the defendant's product. *Id.* at 102. Twice the seller asked the buyer to sign a contract that would formalize the terms of the parties' dealings, including the terms of the box top license, and twice the seller refused. *Id.*
*(Footnote Continued Next Page)*

To summarize the foregoing, courts have consistently found warranty disclaimers unenforceable unless the buyer has a chance to assent to the disclaimer in some fashion. For a "box top" or "shrink wrap" license, the buyer may assent by opening the box or removing the license or refuse by returning the product. The same has been held to be true for consumer goods, where the purchaser cannot read any included warranty documentation until purchasing an item and opening the box. In the case of delivery of heavy machinery where the parties negotiated the sale and the disclaimer accompanied delivery of the machine, courts have declined to enforce warranty disclaimers.[4]

AMI alleges that Winner, as Garmin's agent and authorized dealer, sold AMI the G600 units knowing AMI needed full compatibility between the G600 and the Aircraft's existing KFC 300 autopilot system. AMI argues that Quick, on behalf of Winner and Garmin, had reason to know at the time of contracting that AMI expected the automatic altitude capture to function normally. AMI argues the contracting process was complete when AMI accepted Winner's proposal and made an $80,000.00 down payment.

_(Footnote Continued)_ ————————

Notwithstanding a refund offer included in the box top license, the Third Circuit concluded that the seller did not sufficiently express unwillingness to proceed with the transactions absent buyer's assent to the license. _**Id.**_ at 103. Instantly, the parties have not relied on 13 Pa.C.S.A. § 2207.

[4] A caveat regarding our reliance on case law from other jurisdictions: we find the analysis instructive but have no occasion to approve or disapprove the outcomes in those cases because the facts before us are distinct.

In rejecting AMI's arguments and finding no triable issue of fact as to the validity of the warranty disclaimer, the trial court wrote: "limitation of liability clauses are routinely enforced under the Uniform Commercial Code when contained in sales contracts negotiated between *sophisticated* parties." Trial Court Opinion, 6/18/15, at 11 (quoting **Hornberger**, 929 F. Supp. at 891-92) (trial court's emphasis). The trial court further found that AMI is a sophisticated entity that has bargained for maintenance, upgrades, and replacement parts for its airplanes for many years. *Id.* Thus, AMI's assertion that it did not know of or bargain for the warranty disclaimer "strains credulity to the maximum." *Id.*

In light of the standard of review governing entry of summary judgment, we conclude the trial court's analysis is flawed. Whereas the trial court emphasized the word "sophisticated" in its **Hornberger** quote, we would emphasize "negotiated." Garmin's warranty disclaimer is effective if and only if it is a part of the parties' bargain. Allen testified that he negotiated with Winner, ostensibly as Garmin's agent,[5] for the purchase of new avionics systems that would be compatible with his existing autopilot system. Specifically, Allen testified at his deposition that Quick was his sole source of information about the G600 unit and its compatibility with the

_____

[5] As we noted above, the parties have not addressed the precise nature of the relationship between Garmin and Winner and/or Garmin and AMI. The trial court issued no findings of fact on that issue.

other avionics in the Aircraft. N.T. Deposition of Larry Allen, 7/22/14, at 97-98. Allen testified that he asked Quick for assurances that the G600 was fully compatible with the Aircraft's KFC 300 autopilot system. *Id.* at 140. According to Allen, Quick provided those assurances. *Id.* at 146. Subsequently, AMI accepted Winner's proposal and paid $80,000.00. Quick testified that "they" told him the G600 was compatible with the Aircraft's KFC 300. N.T. Deposition of Peter J. Quick, 6/9/14, at 44. Quick expected the automatic altitude capture feature to continue to work after installation of the G600. *Id.* at 49.

AMI first received the pilot's guide and warranty disclaimer when Allen delivered the Aircraft to Winner in August of 2010. Allen acknowledged that he reviewed the pilot's guide. *Id.* at 111. Also, AMI attached to its answer to Garmin's summary judgment motion several rebate forms it received from Garmin. AMI's Answer to Garmin's Motion for Summary Judgment, 12/2/14, at Exhibits G and H. Those rebate forms indicated the rebate was available for equipment purchased between April 1, 2010 and June 30, 2010—before AMI received the Pilot's Guide. *Id.* The rebate forms required submission of a receipt from a "Garmin authorized dealer." *Id.* AMI applied for and Garmin honored the rebate. *Id.*

On these facts, we find Garmin's analogy to "box top" and "shrink wrap" license cases unavailing. In those cases, the buyer can decline the license terms by returning the software for a refund. On the record before

us, it is not clear whether AMI had the option of returning the G600 units for a refund of its $80,000.00 down payment. The record indicates that Allen and Quick began discussing an avionics update for the Aircraft in 2007 or 2008, culminating in AMI's acceptance of Winner's proposal in April of 2010, Garmin's delivery of the G600s to Winner in Youngstown, and AMI's delivery of the Aircraft to Youngstown in August of 2010. For Allen, this was not a simple matter of reading the terms on the outside of a package and deciding whether to open it or send it back. Likewise, it was not a simple matter of returning consumer goods to the place of purchase. AMI invested considerable time and expense in choosing the G600 systems based on Winner's recommendation, making a substantial down payment, and delivering the Aircraft to Winner. AMI took all of those actions before it received the warranty disclaimer. In this respect, this case is similar to **Marion** or **Bowdoin** wherein the parties negotiated the sale of machinery, and the warranty disclaimer accompanied the machine after the buyer's payment in full.

We conclude, based on all of the foregoing, that a triable issue of fact exists as to whether Garmin's warranty disclaimer was part of the parties' bargain. The trial court, writing that AMI's version of events "strains credulity to the maximum," seemingly chose to view the evidence in the light most favorable to Garmin. AMI, as the non-moving party, was entitled

to have reasonable inferences drawn in its favor. The trial court erred in doing otherwise.

AMI also challenges the trial court's finding that the disclaimer was sufficiently conspicuous pursuant to § 2316. We address this issue briefly because it is an issue for the court (**see** § 13 Pa.C.S.A. § 1201(b)(10) below) and, if AMI is correct, a lack of conspicuity would render the disclaimer unenforceable. The UCC, in addition to the provisions of § 2316, provides the following definition of conspicuous:

> (10) "Conspicuous." With reference to a term, means so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
> (i) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font or color to the surrounding text of the same or lesser size.
>
> (ii) Language in the body of a record or display in larger type than the surrounding text, in contrasting type, font or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

13 Pa.C.S.A. § 1201(b)(10).

Our courts have applied §§ 2316 and 1201(b)(10) as follows:

> Under Pennsylvania law, factors to be considered in determining whether a reasonable person should have noticed a warranty disclaimer include: 1) the disclaimer's placement in the document, 2) the size of the disclaimer's print, and 3) whether the disclaimer was highlighted by being printed in all capital letters or in a type style or color different from the remainder of the document.

*Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 259 (Pa. Super. 1997) (citing *Hornberger*, 929 F. Supp. at 889), *appeal denied*, 725 A.2d 178 (Pa. 1998).  The purpose of this test is to avoid a "fine print waiver of rights." *Id.* (quoting *Moscatiello v. Pittsburgh Contractors Equip. Co.*, 595 A.2d 1190, 1193 (Pa. Super. 1991), *appeal denied*, 602 A.2d 860 (Pa. 1992)). Instantly, the disclaimer appeared on the first page of the pilot's guide under the large font heading "Limited Warranty."  Garmin's Motion for Partial Summary Judgment, 11/17/14, at Exhibit G.  The disclaimer of implied warranty appears in all capital letters:

> This Garmin product is warranted to be free from defects in materials or workmanship for two years from the date of purchase.  Within this period, Garmin will, at its sole option, repair or replace any components that fail in normal use.  Such repairs or replacement will be made at no charge to the customer for parts and labor, provided that the customer shall be responsible for any transportation cost.  This warranty does not cover failures due to abuse, misuse, accident, or unauthorized alterations or repairs.
>
> THE WARRANTIES AND REMEDIES CONTAINED HEREIN ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED OR STATUTORY, INCLUDING ANY LIABILITY ARISING UNDER ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, STATUTORY OR OTHERWISE.  THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, WHICH MAY VARY FROM STATE TO STATE.

*Id.*

Thus, the warranty appears on its own page at the front of the pilot's guide.  The font size is large enough to be easily legible, and the disclaimer stands out in all capital letters.  The *Hornberger* Court found a disclaimer to

be conspicuous where the warranty was set off in a "thick, dark lined box" and where the disclaimer language was in bold print to stand out from the remainder of the warranty. *Hornberger*, 929 F. Supp. at 889. The warranty was in the middle of a 37-page booklet, but the District Court considered the offsetting box and the bold font sufficient to make the disclaimer conspicuous. *Id.* The *Borden* Court found a disclaimer inconspicuous because it appeared in tiny typeface and because all of the font in the warranty language appeared to be bolded. *Borden*, 701 A.2d at 260-61. The disclaimer did not stand out. *Id.* Likewise, the *Moscatiello* Court found a warranty disclaimer unenforceable where it appeared on the reverse side of a sales contract in "extremely" fine print. *Moscatiello*, 595 A.2d at 1193-94.

Here, the warranty and disclaimer appear at the very front of the pilot's guide, with the disclaimer set off in all capitals. In these respects, the disclaimer complies with §§ 2316, 1202, and governing case law. AMI argues the disclaimer is not conspicuous in that the guide is more than three hundred pages long. The length of the book might be significant if the warranty disclaimer was buried somewhere in the middle. We believe the disclaimer's presence on page 'i' alleviates this concern. Moreover, the book describes the operation of an avionics system that AMI's pilots will depend on to fly the Aircraft safely from one location to another. With the lives of AMI's pilots and passengers at stake during a flight, we believe a reasonable

person would read the pilot's guide and notice the warranty disclaimer. We therefore agree with the trial court's conclusion that the disclaimer complies with §§ 2316 and 1201.

To summarize, we conclude the trial court erred in granting Garmin's summary judgment motion based on its warranty disclaimer. Triable issues of fact exist as to whether the disclaimer was part of the parties' bargain.[6] We vacate the order granting summary judgment to Garmin on the implied warranty claim and remand for further proceedings.

Next, AMI argues the trial court erred in granting Winner's motion for compulsory nonsuit on AMI's breach of implied warranty claim against Winner. Rule 230.1 of the Pennsylvania Rules of Civil Procedure governs entry of compulsory nonsuit. Rule 230.1 provides in relevant part:

> (a)(1) In an action involving only one plaintiff and one defendant, the court, on oral motion of the defendant, may enter a nonsuit on any and all causes of action if, at the close of the plaintiff's case on liability, the plaintiff has failed to establish a right to relief.
>
> (2) The court in deciding the motion shall consider only evidence which was introduced by the plaintiff and any evidence favorable to the plaintiff introduced by the defendant prior to the close of the plaintiff's case.

Pa.R.C.P. No. 230.1(a).

Our standard of review is as follows:

_____

[6] In addition, the trial court has not yet addressed whether an implied warranty from Garmin to AMI exists based on Winner's relationship to Garmin.

- 23 -

An order denying a motion to remove a compulsory nonsuit[7] will be reversed on appeal only for an abuse of discretion or error of law. A trial court's entry of compulsory nonsuit is proper where the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action, and it is the duty of the trial court to make a determination prior to submission of the case to a jury. In making this determination the plaintiff must be given the benefit of every fact and all reasonable inferences arising from the evidence and all conflicts in evidence must be resolved in plaintiff's favor.

***Alfonsi v. Huntington Hosp., Inc.***, 798 A.2d 216, 218 (Pa. Super. 2002).

"Additionally, a compulsory nonsuit is valid only in a clear case where the facts and circumstances lead to one conclusion—the absence of liability."

***Harvilla v. Delcamp***, 555 A.2d 763, 764 (Pa. 1989).

The comments to § 2315 of Pennsylvania's UCC provide as follows:

1. Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buyer, of course, must actually be relying on the seller.

2. A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

13 Pa.C.S.A. § 2315, Uniform Commercial Code Comments 1 and 2.

---

[7] AMI filed a timely motion for new trial and removal of the nonsuit.

The trial court entered nonsuit on this claim because Allen did not specifically address automatic altitude capture with Quick. Trial Court Opinion, 6/18/2015, at 37. The trial court also found that neither party was certain the G600 units, once installed would retain all prior functionality. *Id.* In other words, the trial court in granting the nonsuit found Winner had no reason to know that AMI expected automatic altitude capture to function after installation of the G600 units. AMI argues the trial court failed to adhere to the standard governing nonsuits and resolved conflicts of evidence in favor of Winner. We agree. In ruling on Winner's motion for compulsory nonsuit, the trial court should have given AMI the benefit of every fact and drawn all reasonable inferences in AMI's favor. *Alfonsi*, 798 A.2d at 218. As we will demonstrate, the trial court did precisely the opposite, drawing inferences against AMI.

Quick testified as follows:

> Q. Now, when you – when you spoke with Garmin, and this was before – before a proposal had been sent to [Allen]?
>
> A. Yes.
>
> Q. Okay. And they told you that it was approved; that the G600 was approved for that aircraft and for that autopilot, did you talk to them about whether the functionality would be – all the functionality that he had would continue to be there when he got it?
>
> A. We never discussed functionality. We just discussed if it was a compatible system.
>
> Q. But what did you – what did you mean by compatible? What was your understanding of compatible?

A.    Usually when I say that autopilot is compatible of interfacing with a particular vendor's equipment, it usually means it operates that autopilot, you know, functionality-wise, yes.

Q.    So that basically, the same functions that were present before the installation would be present after the installation, is that correct?

A.    I would believe so, yes.

Q.    And that was your understanding?

A.    Yes.

Q.    Okay.  As a result of that, you – you sent to – to [Allen] a proposal to purchase the G600?

A.    Yes.

N.T. Trial, 12/15/14, at 113-14.

Quick also testified:

Q.    If you had known before the installation of the G600s that he – that [the Aircraft] would no longer have the ability for autoleveling at assigned altitude, would you have told [Allen] that?

A.    Of course.

Q.    Why?

A.    It's my responsibility.

*Id.* at 125-26.

Q.    Larry, if – if you had known that auto leveling was not available on the G600 when you – when you purchased it, would you have purchased it?

A.    No.

N.T. Trial, 12/15/14, at 61.

Despite the foregoing, the trial court opined as follows:

- 26 -

Yet, here again, [AMI] insists that, had [Quick] known for sure that altitude capture would not be present in the upgraded [Aircraft], he would have *told* [Allen]. However, [AMI] never fully indicated, nor advised the court, what [Allen] would have done if that circumstance had ever materialized. The fact that [AMI] still owns and is satisfied with this [Aircraft's] performance and that of the G600 avionics equipment package belies any suggestion on [AMI's] part that [Allen] would have cast about for another avionics package more to [AMI's] liking in October of 2010, or sold [the Aircraft] for parts and purchased a brand new plane[.]

Trial Court Opinion, 6/18/2015, at 37 (emphasis in original). The court also found that AMI's assertion of "a warranty of any kind for these products was neither substantiated nor credible." *Id.* at 38.

For purposes of our review of the trial court's entry of compulsory nonsuit, we conclude the record contains more than sufficient evidence from which we can reasonably infer that AMI relied on Winner's expertise to find upgraded avionics units that would retain all of the Aircraft's functionality, and that Winner had reason to realize that AMI wanted a system that was compatible with the Aircraft's KFC 300 autopilot system. Quick frankly acknowledged that he expected the Aircraft to retain all of its prior functionality, and that it was his responsibility to tell Allen in advance if such was not the case. In finding otherwise, the trial court erroneously rejected uncontested evidence. The court also erred in assessing Allen's credibility.

The trial court also found that the disclaimer in Garmin's Pilot's Guide was sufficient to disclaim any implied warranty from Winner to AMI. Trial Court Opinion, 6/18/15, at 38. For reasons we explained in depth above, it

is not clear that the disclaimer ever was a part of the bargain. Based on all of the foregoing, we conclude the trial court erred in granting Winner's motion for compulsory nonsuit on AMI's implied warranty claim.

AMI's final two assertions of error address the trial court entry of nonsuit on its express warranty and breach of contract claims. We will address these arguments together. To succeed on a breach of contract claim, a plaintiff must prove the existence of a contract and its essential terms, breach of a contractual duty, and damages. *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. 2005), *appeal denied*, 897 A.2d 458 (Pa. 2006). The Uniform Commercial Code defines an express warranty as follows:

> **(a) General rule.**--Express warranties by the seller are created as follows:
>
> (1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> [. . .]
>
> **(b) Formal words or specific intent unnecessary.**--It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the opinion of the seller or commendation of the goods does not create a warranty.

13 Pa.C.S.A. § 2313.

The trial court offered several bases for its entry of compulsory nonsuit: mutual mistake, impossibility/impracticability of performance (Trial Court Opinion, 6/18/2015, at 31-32); Allen's lack of credibility (*Id.* at 11-12); AMI's failure to prove that it sustained damages (*Id.* at 19-22; 26-27, 40); and AMI's failure to seek specific assurances regarding automatic altitude capture (*Id.* at 20, 37).

We begin with an analysis of whether the record supports a reasonable inference that Winner promised automatic altitude capture. AMI and Winner agree that the two-page purchase order constitutes the contract between them. That document contains no warranty disclaimer, nor does it address automatic altitude capture or any other specific feature. The purchase order contains no integration clause.

AMI's causes of action rest on Allen's conversations with Quick. As we have already described above, Allen and Quick both expected the Aircraft to retain all of its functionality after the upgrade. They did not specifically address automatic altitude capture or any other specific function. We believe the record supports at least a reasonable inference that all functionality includes automatic altitude capture. Also, we believe it is reasonable to infer that an aircraft avionics system contains far too many functions for the parties to list them all prior to entering into the purchase order agreement.

We will now examine the trial court's reasons for entering a compulsory nonsuit, beginning with mutual mistake.

> The doctrine of mutual mistake of fact serves as a defense to the formation of a contract and occurs when the parties to the contract have an erroneous belief as to a basic assumption of the contract at the time of formation which will have a material effect on the agreed exchange as to either party. A mutual mistake occurs when the written instrument fails to set forth the true agreement of the parties. The language on the instrument should be interpreted in the light of subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed.

*Voracek v. Crown Castle USA Inc.*, 907 A.2d 1105, 1107-08 (Pa. Super. 2006), *appeal denied*, 919 A.2d 958 (Pa. 2007). Courts can reform a contract entered under mutual mistake if "(1) the misconception entered into the contemplation of both parties as a condition of assent, and (2) the parties can be placed in their former position regarding the subject matter of the contract." *Id.* at 1108.[8]

---

[8] Pennsylvania Courts also rely on the Restatement (Second) of Contracts:

> (1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

> (2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.

*(Footnote Continued Next Page)*

Mutual mistake is inapplicable here because we cannot place AMI in its former position regarding the subject matter of the contract. Winner has been paid $150,000 for installation of the G600 units in the Aircraft, and the record contains no evidence that the installation can be undone and AMI's money refunded. Further, as we explained in connection with AMI's implied warranty claim against Winner, the record supports an inference that AMI relied on Winner's expertise in selecting an avionics unit. A mistake cannot be mutual where party A relies on party B's expertise and party B makes a mistake in the exercise of its expertise.

Similarly, we conclude the trial court erred in relying on impracticability of performance. Pennsylvania follows the Restatement (Second) of Contracts on impracticability:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*Hart*, 884 A.2d at 334 (citing Restatement (Second) of Contracts § 261).

Given AMI's reliance on Winner's expertise, Winner arguably is at fault here for failing to discover that the G600 units were not fully compatible with the Aircraft's existing autopilot system. Furthermore, it is unclear from the

*(Footnote Continued)* ────────────

*Hart*, 884 A.2d at 333 (citing Restatment (Second) of Contracts, § 152 (1981)).

record whether Garmin's planned software patch was impracticable, or whether Garmin simply chose not to do it. The record does not support a finding of impracticability of performance.[9]

The trial court also entered nonsuit because it found AMI failed to prove damages. Section 2714 of the UCC governs buyer's damages for accepted goods where the seller is in breach of warranty:

> **(b) Measure of damages for breach of warranty.**--The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

13 Pa.C.S.A. § 2714(b). According to AMI's evidence and argument, it paid $150,000.00 and received a performance worth only $60,000.00. AMI arrived at the $60,000.00 valuation based on the $90,000.00 it must spend for a new autopilot system that will support automatic altitude capture with the G600 units.

The trial court found the difference between automatic and push button functionality to be minimal. Trial Court Opinion, 6/18/2015, at 20

_____

[9] Furthermore, since Winner has completed installation of the G600 units and been paid in full, the pertinent question is whether and to what extent AMI is entitled to damages for the absence of automatic altitude capture. *See, e.g.*, *Step Plan Servs., Inc. v. Koresko*, 12 A.3d 401, 412 (Pa. Super. 2010) ("If a party proceeds under the original contract, despite the impracticability that would otherwise justify his non-performance, and is then unable to perform as previously agreed, he can be liable for damages."). We discuss damages more fully in the main text.

("[AMI's] counsel also disingenuously suggested that the necessity of pushing a button to level off the climbing aircraft added burdensomely to the pilot's workload[.]"). The court also noted that the Aircraft still has altitude capture, but it is not automatic and "requires the exercising of a little elbow grease on Allen's part." *Id.* at 27. The trial court also found that $90,000.00 was an unreasonably high request, and that AMI offered no evidence to support any lesser number. *Id.* at 22, 27. The court found no damages because AMI needed to upgrade the Aircraft anyways, and therefore would have purchased the G600 units regardless of the compatibility issue. *Id.* at 26, 37.

We agree with the trial court insofar as it determined that the cost of remediating the damages—$90,000.00—may not necessarily represent the difference in value between the Aircraft as promised and the Aircraft as delivered. Section 2714(b), quoted above, provides that the measure of damages is the difference in value between the goods as promised and the goods received. In this case, that means the difference in value of the Aircraft with automatic altitude capture and the value of the Aircraft with push-button altitude capture. Nonetheless, law governing nonsuits and the facts of record do not justify the trial court's entry of nonsuit because AMI proved **no** damages. If Winner believes the difference in value of the Aircraft with and without automatic altitude capture is less than that claimed by AMI, it can introduce evidence to that effect in its defense.

The trial court was required to accept all facts and draw reasonable inferences in favor of AMI. *Alfonsi*, 798 A.2d at 218. The trial court reasoning—that the Aircraft's pilot just needs to use "a little elbow grease" and that AMI must upgrade the Aircraft anyway—do not comport with *Alfonsi*. Both findings are speculative, and they rest on inferences adverse to the nonmoving party. Also, they ignore AMI's entitlement to damages if a breach is found. The trial court's willingness to tell a pilot that he does not need automatic altitude capture is particularly disturbing. Furthermore, the trial court's finding that AMI would have upgraded Aircraft anyways is directly contradictory to Allen's testimony. N.T. Trial, 12/15/14, at 61.

The trial court also wrote: "[AMI's] allegations of feeling bamboozled by [Appellees] into believing that there would be total compatibility between its worn out and increasingly hard to replace analog cockpit avionics and the near total modern digital upgrade [Allen] was purchasing is, in a word, incredible." *Id.* at 11-12. The trial court's rejection of Allen's credibility was not permissible in deciding Winner's motion for compulsory nonsuit.

For all of the foregoing reasons, we conclude the trial court erred in granting nonsuit on AMI's breach of contract and express warranty claims.

In summary, we have concluded the trial court erred in entering partial summary judgment in favor of Garmin on AMI's breach of implied warranty claim, and we have concluded the trial court erred in entering compulsory nonsuit in favor of Winner on AMI's claims of breach of express warranty,

implied warranty, and breach of contract. Our result rests largely on the standards governing trial court and appellate court review of those issues. We therefore reverse the trial court's order and remand for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2016